**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
Robert N. Fisher (SBN 302919)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
christina@chumphreylaw.com
rob@chumphreylaw.com

**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
james.clark@towerlegalgroup.com
renee.parras@towerlegalgroup.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

AARON MUNOZ, CYNDY PANIAGUA, and MELISSA OLSEN, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the ALORICA 401(K) RETIREMENT PLAN,

Plaintiffs,

v.

ALORICA, INC.; ALORICA RETIREMENT SAVINGS PLAN COMMITTEE; LISA ADAMSHICK; JOYCE TODD-GUERRA; CHRIS HYUN; ELIZABETH LAN PAN; EMILY KILGORE; RICK HAYES; DEON STENNER; MATTHEW VONDETTE; DAN FINNEGAN; JAE CHANEY; MORGAN STANLEY SMITH BARNEY, LLC; and DOES 1 through 50,

Defendants.

**CASE NO.:**
**8:22-cv-01856-JWH-DFM**

Hon. Judge John W. Holcomb

**SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION …………………………………………...………..…..….…….1

JURISDICTION AND VENUE…………………………..……………………….4

THE PARTIES……………………………………………….…..……………….5

    Plaintiffs…………….……...………………………………..……………….5

    Defendants……………........……………………………………………….6

    Parties in Interest……………………...……...………………….…………....7

DEFENDANTS' FIDUCIARY OBLIGATIONS….………….….……...…………..9

DEFINED CONTRIBUTION 401(K) PLANS AND THE IMPACT OF

EXCESSIVE FEES………….…….…………..…..…………………………...........10

FACTUAL ALLEGATIONS……………………………...…………….…..……...12

    A.    Defendants failed to timely form an Investment Committee or conduct

           regular committee meetings during the relevant time period………..12

    B.    Defendants Caused the Plan Participants to Pay Excessive Fees and

           Lose Returns by Failing to Offer, Monitor, and Investigate Available

           Lower Cost Mutual Share Classes as Plan Investment

           Options………………………………………….…………....…....12

    C.    Defendants Paid MassMutual and MSSB Unreasonable Fees and

           Failed to Monitor MassMutual and MSSB, and Failed to make

           Requests for Proposals from Other Covered Service

           Providers…………………………………………………….…...19

    D.    Defendants Selected and Maintained Imprudent Funds that Fell Below

           the Reasonable Standard of Care……………………….…..……..28

           1. Defendants Chose and Continued to Include Investments Lagging

              in Benchmark Comparisons……………………………………...28

              a.    Defendants selected and retained funds that performed

                   poorly and for which the costs of active management were

                   not justified…………………………………………….…..28

SECOND AMENDED CLASS ACTION COMPLAINT

b.  Defendants selected and retained funds that performed poorly as compared to their self-selected benchmarks and Morningstar calculated benchmarks………………....…..39

2.  Defendants maintained higher fee funds which underperformed their lower fee replacements………………..…….…………..….45

3.  Defendants Imprudently Maintained the Plan's Investment in the MassMutual Stable Value Option, When Lower Share Classes Existed and Other Investment Vendor Offered Superior Alternatives………………………………………………………50

CLASS ACTION ALLEGATIONS………………………….............…………..55

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)……………………………………………….…..…….…….56

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants)…………………………………….…………………..….58

PRAYER FOR RELIEF………………………………………….....……….60

SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Aaron Munoz, Cyndy Paniagua, and Melissa Olsen (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the ALORICA 401(K) RETIREMENT PLAN, (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 et seq., on behalf of the Plan against current Plan sponsor, Alorica, Inc. ("Alorica"), the Alorica Retirement Savings Plan Committee ("Plan Committee" or "Committee"), Lisa Adamshick; Joyce Todd-Guerra; Chris Hyun; Elizabeth Lan Pan; Emily Kilgore; Rick Hayes; Deon Stenner; Matthew VonDette; Dan Finnegan; Jae Chaney; Morgan Stanley Smith Barney, LLC ("MSSB") and John Does 1-50 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.    This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds.  The 401k plan has become the dominant source of retirement savings for most Americans.  Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.  This action is filed to recover funds owed back to the plan on behalf of employees / participants / beneficiaries.  These retirement funds are significant to the welfare of the class.

2.    Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans").  These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment.  To enjoy this benefit, employers must follow the rules and standards

proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

3.    The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits.  However, Defendants have not followed ERISA's standard of care.  This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits taken from Plan participants by Defendants.

4.    The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.  As of December 31, 2022, the Plan had approximately 3,900 total participants and $128,878,451 in assets.

5.    ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1).  A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id.*  A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

6.    Defendants breached their fiduciary duties to the Plan and its participants because the Plan had more than sufficient bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds and failed to do so.

7.    Plainly, the Defendants had insufficient processes in place to ensure that the Plan Participants were provided with prudent investment options and that they paid only reasonable fees.

8.    Specifically, Alorica and the other Defendants breached their fiduciary duties of prudence and loyalty to the Plan by:

a. Failing to timely create an investment committee to manage the Plan or oversee the Plan's advisors including MassMutual and MSSB who were incentivized to maintain higher than necessary fees and funds that could be used to pay those fees;

b. Offering and maintaining higher-cost share classes when identical lower cost class shares were available and could have been offered to participants resulting in participants/beneficiaries paying unnecessary costs for services that provided no value to them and resulted in a reduction of compounded return gains;

c. Offering poorly performing actively managed funds when passively managed funds with identical investment goals and significantly lower fees were available and could have been offered to participants and sufficient passively managed funds were not offered to participants resulting in participants/beneficiaries paying unnecessary costs for services that provided no value to them and resulted in a reduction of compounded return gains;

d. Offering poorly performing funds which failed to outperform their benchmarks;

e. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment option under the Plan, which exceeded costs incurred by plans of similar size with similar services and which were in excess of and not tethered to the services provided;

f. Failing to engage in a competitive bidding process by failing to submit a Request for Proposal to multiple service providers such as record keepers, shareholder services and financial advisers;

g. Imprudently choosing[1] and retaining expensive funds that consistently failed to: (1) meet appropriate industry-standard benchmarks, (2) had excessive risk

---

[1] Plaintiffs' claims for breach of fiduciary duty based on improper selection of funds are limited to funds selected during the Class Period. Any discussion of fund

of loss, or (3) had insufficient management tenure or history to be offered in the plan;

h. Through the excessive fees paid to Covered Service Providers and investment in expensive funds depriving participants of compounded returns which greatly exceed the annual cost of fees and revenue sharing;

i. Offering a guaranteed income product that had unnecessarily high risk and low returns; and

j. Failing to maintain and restore trust assets.

9. Plaintiffs were injured during the Relevant Time Period by the Defendants' flawed processes in breach of their fiduciary duties. As a result of Defendant's actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants and resulting in a loss of compounded returns.

10. Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

11. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

---

selection prior to the class period is provided to give necessary context to Plaintiffs' claims for breach of fiduciary duty based on improper retention of funds.

SECOND AMENDED CLASS ACTION COMPLAINT

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1).

13.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, one or more Plaintiffs reside and were employed in this District, and because ERISA provides for nationwide service of process.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiffs were employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## **THE PARTIES**

### *Plaintiffs*

15.     Plaintiff Aaron Munoz resides in Miami, Florida, and was an employee of Alorica, Inc.  Munoz is a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.   Munoz was damaged by the Defendants' breaches of their fiduciary duties impacted the Plan as a whole and damaged all Plan participants.

16.     Plaintiff Cindy Paniagua resides in Homestead, Florida, and was an employee of Alorica, Inc.  Paniagua was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.   Paniagua was damaged by the Defendants' breaches of their fiduciary duties impacted the Plan as a whole and damaged all Plan participants.

17.    Plaintiff Melissa Olsen resides in Cedar Rapids, Iowa, and was an employee of Alorica, Inc.  Olsen was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action. Olsen was damaged by the Defendants' breaches of their fiduciary duties impacted the Plan as a whole and damaged all Plan participants.

18.    Munoz, Paniagua, and Olsen (Plaintiffs) have standing under 29 U.S.C. §1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and insouciant actions caused actual harm to an ERISA plan in which the Plaintiffs participate. Plaintiffs suffered an injury in fact by, *inter alia*, investing in the higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan, being forced into high expense investments because lower choice investments were not made available, being deprived of a high quality and secure stable value investment option, and paying excessive fees to covered service providers. Defendants are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

### *Defendants*

19.    Defendant ALORICA, INC. ("Alorica") is the current sponsor and administrator of the Plan and maintains its principal place of business at 5161 California Ave, Irvine, CA 92617.  Alorica is registered with the State of California and upon information and belief, operates as a sponsor and administrator and/or fiduciary of the Plan.

20.    Defendant the Alorica Retirement Savings Plan Committee is composed of a group of fiduciaries of the plan tasked with administering and overseeing the Plan including selecting, monitoring and maintaining the best interests of the plan participants and beneficiaries.

21.    Defendant Morgan Stanley Smith Barney LLC served as the Plan's Investment Advisor during the relevant time period and was a "3(21)" co-fiduciary

for the Plan.  Prior to the institution of the Committee in 2018, MSSB effectively made decisions on behalf of the Plan including with respect to Plan investments and fees with little oversight.

22.    Defendants Chris Hyun, Elizabeth Lan Pan, Emily Kilgore, Rick Hayes, Deon Stenner, Matthew VonDette, Dan Finnegan, and Jae Chaney, served as voting members on the Plan Committee during the relevant time period.

23.    A table of the committee meetings attended by each of the Defendants listed above, as well as the non-voting members of the committee is annexed hereto as Exhibit A.

24.    The Committee members were responsible for oversight of the Plan's assets and investments and overseeing the Plan's covered service providers.

25.    During the relevant time period, MSSB repeatedly offered to take over additional responsibilities from the Committee as a "3(38) fiduciary" but the Committee members did not act to effectuate this change and instead chose to retain their final decision-making authority for managing the Plan's investments.

26.    Defendant Adamshick was Alorica's Director of Benefits during portions of the relevant time period and executed documents on behalf of the Plan. On information and belief, prior to the formation of the Committee, Ms. Adamshick was responsible for the management of the Plan and thus served as a fiduciary for the Plan with respect to the conduct complained of herein.

27.    Defendant Todd-Guerra was Alorica's VP of Global Benefits during portions of the relevant time period, and executed documents on behalf of the Plan. On information and belief, prior to the formation of the Committee, Ms. Todd-Guerra was responsible for the management of the Plan and thus served as a fiduciary for the Plan with respect to the conduct complained of herein.

28.    Alorica, the Board of Directors, the Investment Committee, the Plan's manager, and the Directors and Officers are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in

whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

29.    Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

30.    Although not named as parties, the Plan also contracted with other service providers, including those discussed below.

31.    Effective April 22, 2016, Reliance succeeded State Street Corporation as trustee for the Plan as reflected in a Trustee Appointment executed by the Plan. Reliance Trust Company, Trustee of The Alorica 401(K) Retirement Plan ("RTC") maintains its principal place of business at 1100 Abernathy Road NE, Suite 400, Atlanta GA 30328. This entity is not registered with the State of California.

32.    Massachusetts Mutual Life Insurance Company ("MassMutual") served as the recordkeeper of the Plan from 2011 to 2021 when MassMutual was acquired by Empower Retirement. On information and belief, Empower Retirement is MassMutual's successor-in-interest and assumed its role *vis-à-vis* the Plan. Accordingly, the Complaint references MassMutual as the Plan's recordkeeper, which it was during the majority of the relevant time period. But, on information and belief, Empower Retirement is the true party in interest and references to MassMutual in the Plan refer to both MassMutual and Empower Retirement. On information and belief, Merrill Lynch (Bank of America) was hired to replace Empower on or about October 3, 2022.

33.    Alorica had a concomitant fiduciary duty to monitor and supervise those appointees and contracted parties.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

34.    ERISA and common law trusts imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

35.    29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

36.    A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. at 1829.

37.    29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." MassMutual and MSSB are "parties in interest" under 29 U.S.C. §1106(a)(1)(C).

38.    29 U.S.C. §1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

39.    Section 1109(a) and common law provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

"One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959); *see Eaves v. Penn*, 587 F.2d at 463.

## DEFINED CONTRIBUTION 401(K) PLANS
## AND THE IMPACT OF EXCESSIVE FEES

40.     In a defined contribution plan, participants (and sometimes their employer) make contributions to plan participant's individual accounts.  Participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus any investment gains less plan and investment expenses.    *See* 29 U.S.C. §1002(34).  Plan Participants' investments are held in trust.  Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

41.     Because retirement savings in defined contribution plans are intended to grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire.  Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement.  As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825.  In short, the damages caused by breaches of fiduciary duties to the Plan cause damages that continue to accrue and compound over time.

42.     In fact, the impact of excessive fees on employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement

SECOND AMENDED CLASS ACTION COMPLAINT

assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[2]

43.     "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time.

44.     Accordingly, courts have recognized that plan fiduciaries "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

45.     The marketplace for retirement plan services is established and competitive.  Because the Plan has a large number of participants and significant assets, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

---

[2] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

SECOND AMENDED CLASS ACTION COMPLAINT

# FACTUAL ALLEGATIONS

**A.**  **Defendants failed to timely form an Investment Committee or conduct regular committee meetings during the relevant time period.**

46.    During part of the relevant time period, the Plan had no Investment Committee to monitor the performance of the Plan's investments and the Plan's fees.

47.    That only changed in August 2018, when the Alorica Board of Directors finally adopted a Plan Committee Charter.

48.    On November 15, 2018, the Plan's Investment Committee convened. During that committee meeting, the Alorica Investment Committee members met the Plan's covered service providers and Defendants discussed the fact that no Committee Meetings had occurred for over two years.

49.    MSSB indicated that in the absence of a committee, it had "monitored the plan investments on an ongoing basis."

**B.**  **Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options.**

50.    Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

51.    Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class.

52.    A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging a higher class share in that same fund an expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher

-12-

1  operating expense. Generally, lower cost class shares are available to larger
2  investors, such as 401(k) plans like the Plan.

3      53.    Plans that invest their participants' funds in higher cost share classes
4  and subject them to higher fees engage in share class violations which are the most
5  clear and obvious breaches of fiduciary duties in the Plan. *See Tibble v. Edison*,
6  2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the
7  institutional share classes are otherwise identical to the retail share classes, but with
8  lower fees, a prudent fiduciary would know immediately that a switch is
9  necessary.").

10     54.    Since at least 2016 through late-2022, Defendants offered higher cost
11  mutual fund share classes as investment options for the Plan even though at all times
12  lower cost class shares of those exact same mutual funds were readily available to
13  the Plan.

14     55.    Indeed, Defendants provided as many as 39 fund choices with high feee
15  share classes.

16     56.    Defendants selected the Plan's investment options. In this case, on
17  information and belief, MassMutual, the Plan's recordkeeper, provided Defendants
18  with a universe of pooled investment options from which to select a subset to offer
19  Plaintiffs and the other Plan participants.  MSSB also created an approved list of
20  funds which could be selected by the Committee.

21     57.    Defendants chose and continued to maintain a pool of investment
22  options including those offered by MassMutual which benefitted MassMutual at the
23  expense of participants and beneficiaries of the Plan both through the investments'
24  and management fees and by routinely offering higher cost share classes rather than
25  readily available lower cost options.

26     58.    It was only after Defendants finally conducted an RFP for recordkeepers
27  and transitioned away from MassMutual in late-2022 that they removed high fee
28  share classes from the Plan.

SECOND AMENDED CLASS ACTION COMPLAINT

**Summary Table**

|  | 2022* | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|---|---|
| Total Funds # | 37 | 40 | 39 | 32 | 30 | 30 | 29 |
| Cheaper Shares Classes Available # | 0 | 31 | 35 | 28 | 28 | 28 | 28 |
| Cheaper Shares Classes Available % | 0% | 78% | 90% | 88% | 93% | 93% | 97% |

*As of 10/3/2022*

59.    To highlight the harm caused by the Defendants' imprudent selection of high-cost share classes, the chart below shows the total return lag for several illustrative high-fee share classes that Defendants maintained in the Plan during the relevant time period.

| Begin Date | End Date | Name | Expense Ratio % | Total Return Lag During SOL (%) | Total Return Lag During SOL ($) | Annualized Difference |
|---|---|---|---|---|---|---|
| 10/12/2016 | 5/5/2019 | MM S&P 500® Index Svc | 0.37 | 43.67 | | |
| | | MM S&P 500® Index I | 0.12 | 44.55 | | |
| | | *Cost of Expensive Share Classes* | -0.25 | -0.88 | 22,758 | -0.34 |
| 5/6/2019 | 9/30/2022 | MM S&P 500® Index R5 | 0.22 | 28.12 | | |
| | | MM S&P 500® Index I | 0.12 | 28.65 | | |
| | | *Cost of Expensive Share Classes* | -0.10 | -0.53 | 84,055 | -0.16 |
| 11/15/2016 | 9/30/2022 | JHancock US Global Leaders Growth I | 0.88 | 90.21 | | |
| | | JHancock US Global Leaders Growth R6 | 0.77 | 91.41 | | |
| | | *Cost of Expensive Share Classes* | -0.11 | -1.20 | 100,534 | -0.20 |
| 10/12/2016 | 9/30/2022 | MassMutual Growth Opps Svc | 0.96 | 52.29 | | |
| | | MassMutual Growth Opps I | 0.76 | 54.06 | | |
| | | *Cost of Expensive Share Classes* | -0.20 | -1.77 | 18,645 | -0.30 |
| 10/12/2016 | 6/30/2021 | Delaware Value® Inst | 0.68 | 56.35 | | |
| | | Delaware Value® R6 | 0.59 | 57.05 | | |
| | | *Cost of Expensive Share Classes* | -0.09 | -0.70 | 24,401 | -0.15 |
| 10/12/2016 | 6/30/2021 | Invesco Diversified Dividend A | 0.82 | 50.67 | | |
| | | Invesco Diversified Dividend R6 | 0.46 | 53.50 | | |
| | | *Cost of Expensive Share Classes* | -0.36 | -2.83 | 32,765 | -0.60 |
| 10/23/2017 | 9/30/2022 | MassMutual Mid Cap Growth Svc | 0.86 | 32.77 | | |
| | | MassMutual Mid Cap Growth I | 0.66 | 34.05 | | |
| | | *Cost of Expensive Share Classes* | -0.20 | -1.28 | 21,425 | -0.26 |
| 10/12/2016 | 10/22/2017 | PGIM Jennison Mid-Cap Growth Z | 0.73 | 21.80 | | |
| | | PGIM Jennison Mid-Cap Growth R6 | 0.60 | 22.04 | | |
| | | *Cost of Expensive Share Classes* | -0.13 | -0.24 | 4,319 | -0.23 |
| 10/12/2016 | 9/30/2022 | T. Rowe Price New Horizons | 0.79 | 106.84 | | |
| | | T. Rowe Price New Horizons I | 0.66 | 108.34 | | |
| | | *Cost of Expensive Share Classes* | -0.13 | -1.50 | 36,344 | -0.25 |
| 10/12/2016 | 6/30/2022 | Allspring Special Mid Cap Value Admin | 1.05 | 62.77 | | |
| | | Allspring Special Mid Cap Value R6 | 0.70 | 66.04 | | |
| | | *Cost of Expensive Share Classes* | -0.35 | -3.27 | 95,246 | -0.57 |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/4/2020 | 9/30/2022 | Delaware Small Cap Core I | 0.80 | 19.98 | | |
| | | Delaware Small Cap Core R6 | 0.69 | 20.26 | | |
| | | *Cost of Expensive Share Classes* | -0.11 | -0.28 | 1,282 | -0.14 |
| 10/12/2016 | 6/30/2021 | Allspring Special Small Cap Value Adm | 1.18 | 71.90 | | |
| | | Allspring Special Small Cap Value R6 | 0.83 | 74.61 | | |
| | | *Cost of Expensive Share Classes* | -0.35 | -2.71 | 10,082 | -0.57 |
| 10/12/2016 | 9/3/2020 | American Funds Europacific Growth R4 | 0.82 | 43.67 | | |
| | | American Funds Europacific Growth R6 | 0.47 | 45.62 | | |
| | | *Cost of Expensive Share Classes* | -0.35 | -1.95 | 45,685 | -0.50 |
| 5/6/2019 | 9/30/2022 | ClearBridge International Growth I | 0.79 | -1.85 | | |
| | | ClearBridge International Growth IS | 0.70 | -1.53 | | |
| | | *Cost of Expensive Share Classes* | -0.09 | -0.32 | 14,490 | -0.09 |
| 11/15/2016 | 5/5/2019 | Invesco Oppenheimer Intl Growth A | 1.08 | 23.11 | | |
| | | Invesco Oppenheimer Intl Growth R6 | 0.69 | 24.44 | | |
| | | *Cost of Expensive Share Classes* | -0.39 | -1.33 | 19,171 | -0.54 |
| 11/15/2016 | 9/30/2022 | Janus Henderson Global Equity Income I | 0.87 | 20.24 | | |
| | | Janus Henderson Global Equity Income N | 0.78 | 20.72 | | |
| | | *Cost of Expensive Share Classes* | -0.09 | -0.48 | 2,211 | -0.08 |
| 10/12/2016 | 9/30/2022 | Invesco Developing Markets Y | 0.99 | 2.34 | | |
| | | Invesco Developing Markets R6 | 0.84 | 3.31 | | |
| | | *Cost of Expensive Share Classes* | -0.15 | -0.97 | 5,440 | -0.16 |
| 10/12/2016 | 9/30/2022 | American Funds Capital World Gr&Inc R4 | 0.78 | 37.71 | | |
| | | American Funds Capital World Gr&Inc R6 | 0.42 | 40.58 | | |
| | | *Cost of Expensive Share Classes* | -0.36 | -2.87 | 33,056 | -0.48 |
| 9/4/2020 | 6/30/2021 | American Funds New Perspective R4 | 0.77 | 27.84 | | |
| | | American Funds New Perspective R6 | 0.42 | 28.21 | | |
| | | *Cost of Expensive Share Classes* | -0.35 | -0.37 | 14,730 | -0.45 |
| 10/23/2017 | 6/30/2021 | Janus Henderson Glb Tech and Innovt T | 0.91 | 160.55 | | |
| | | Janus Henderson Glb Tech and Innovt N | 0.67 | 162.83 | | |
| | | *Cost of Expensive Share Classes* | -0.24 | -2.28 | 2,289 | -0.62 |
| 10/12/2016 | 5/5/2019 | Loomis Sayles Strategic Income A | 0.93 | 9.88 | | |
| | | Loomis Sayles Strategic Income N | 0.63 | 10.84 | | |
| | | *Cost of Expensive Share Classes* | -0.30 | -0.96 | 10,100 | -0.37 |
| 10/12/2016 | 6/30/2021 | Western Asset Core Plus Bond A | 0.82 | 22.59 | | |
| | | Western Asset Core Plus Bond IS | 0.42 | 24.91 | | |
| | | *Cost of Expensive Share Classes* | -0.40 | -2.32 | 184,142 | -0.49 |
| 10/12/2016 | 9/30/2022 | MassMutual High Yield Svc | 0.74 | 15.50 | | |
| | | MassMutual High Yield I | 0.54 | 16.91 | | |
| | | *Cost of Expensive Share Classes* | -0.20 | -1.41 | 20,282 | -0.24 |
| 10/12/2016 | 5/5/2019 | PIMCO International Bond (USD-Hdg) A | 1.03 | 8.19 | | |
| | | PIMCO International Bond (USD-Hdg) Instl | 0.63 | 9.31 | | |
| | | *Cost of Expensive Share Classes* | -0.40 | -1.12 | 22,745 | -0.44 |
| 5/6/2019 | 6/30/2021 | PIMCO International Bond (USD-Hdg) Adm | 0.88 | 8.47 | | |
| | | PIMCO International Bond (USD-Hdg) Instl | 0.63 | 9.06 | | |
| | | *Cost of Expensive Share Classes* | -0.25 | -0.59 | 13,198 | -0.27 |
| 11/15/2016 | 9/30/2022 | American Funds American Balanced R4 | 0.60 | 42.57 | | |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | | |
|---|---|---|---|---|---|---|
| | | American Funds American Balanced R6 | 0.25 | 45.47 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-2.90* | *9,162* | *-0.49* |
| 10/12/2016 | 9/3/2020 | JPMorgan SmartRetirement Income A | 0.69 | 24.95 | | |
| | | JPMorgan SmartRetirement Income R6 | 0.34 | 26.43 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-1.48* | *6,545* | *-0.38* |
| 10/12/2016 | 9/3/2020 | JPMorgan SmartRetirement 2020 A | 0.75 | 29.34 | | |
| | | JPMorgan SmartRetirement 2020 R6 | 0.34 | 31.09 | | |
| | | *Cost of Expensive Share Classes* | *-0.41* | *-1.75* | *44,190* | *-0.45* |
| 10/12/2016 | 9/3/2020 | JPMorgan SmartRetirement 2030 A | 0.79 | 37.00 | | |
| | | JPMorgan SmartRetirement 2030 R6 | 0.35 | 38.94 | | |
| | | *Cost of Expensive Share Classes* | *-0.44* | *-1.94* | *100,540* | *-0.50* |
| 10/12/2016 | 9/3/2020 | JPMorgan SmartRetirement 2040 A | 0.84 | 41.99 | | |
| | | JPMorgan SmartRetirement 2040 R6 | 0.40 | 44.04 | | |
| | | *Cost of Expensive Share Classes* | *-0.44* | *-2.05* | *114,137* | *-0.53* |
| 10/12/2016 | 9/3/2020 | JPMorgan SmartRetirement 2050 A | 0.85 | 42.03 | | |
| | | JPMorgan SmartRetirement 2050 R6 | 0.41 | 44.16 | | |
| | | *Cost of Expensive Share Classes* | *-0.44* | *-2.13* | *15,721* | *-0.55* |
| 9/4/2020 | 9/30/2022 | American Funds 2010 Trgt Date Retire R4 | 0.64 | -2.77 | | |
| | | American Funds 2010 Trgt Date Retire R6 | 0.29 | -2.05 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.72* | *5,161* | *-0.35* |
| 9/4/2020 | 9/30/2022 | American Funds 2015 Trgt Date Retire R4 | 0.65 | -2.81 | | |
| | | American Funds 2015 Trgt Date Retire R6 | 0.30 | -2.12 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.69* | *10* | *-0.33* |
| 9/4/2020 | 9/30/2022 | American Funds 2020 Trgt Date Retire R4 | 0.66 | -3.42 | | |
| | | American Funds 2020 Trgt Date Retire R6 | 0.31 | -2.65 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.77* | *22,992* | *-0.37* |
| 9/4/2020 | 9/30/2022 | American Funds 2025 Trgt Date Retire R4 | 0.67 | -3.68 | | |
| | | American Funds 2025 Trgt Date Retire R6 | 0.32 | -3.01 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.67* | *140* | *-0.32* |
| 9/4/2020 | 9/30/2022 | American Funds 2030 Trgt Date Retire R4 | 0.68 | -3.25 | | |
| | | American Funds 2030 Trgt Date Retire R6 | 0.33 | -2.53 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.72* | *58,527* | *-0.35* |
| 9/4/2020 | 9/30/2022 | American Funds 2035 Trgt Date Retire R4 | 0.70 | -2.07 | | |
| | | American Funds 2035 Trgt Date Retire R6 | 0.35 | -1.34 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.73* | *343* | *-0.35* |
| 9/4/2020 | 9/30/2022 | American Funds 2040 Trgt Date Retire R4 | 0.72 | -2.06 | | |
| | | American Funds 2040 Trgt Date Retire R6 | 0.37 | -1.35 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.71* | *48,952* | *-0.34* |
| 9/4/2020 | 9/30/2022 | American Funds 2045 Trgt Date Retire R4 | 0.72 | -2.38 | | |
| | | American Funds 2045 Trgt Date Retire R6 | 0.37 | -1.65 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.73* | *587* | *-0.35* |
| 9/4/2020 | 9/30/2022 | American Funds 2050 Trgt Date Retire R4 | 0.72 | -3.04 | | |
| | | American Funds 2050 Trgt Date Retire R6 | 0.37 | -2.28 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.76* | *11,252* | *-0.37* |
| 9/4/2020 | 9/30/2022 | American Funds 2055 Trgt Date Retire R4 | 0.73 | -3.62 | | |
| | | American Funds 2055 Trgt Date Retire R6 | 0.38 | -2.96 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.66* | *289* | *-0.32* |
| 9/4/2020 | 9/30/2022 | American Funds 2060 Trgt Date Retire R4 | 0.74 | -3.85 | | |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | | |
|---|---|---|---|---|---|---|
| | | American Funds 2060 Trgt Date Retire R6 | 0.39 | -3.12 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.73* | *80* | *-0.35* |
| 9/4/2020 | 9/30/2022 | American Funds 2065 Trgt Date Retire R4 | 0.74 | -3.78 | | |
| | | American Funds 2065 Trgt Date Retire R6 | 0.39 | -3.09 | | |
| | | *Cost of Expensive Share Classes* | *-0.35* | *-0.69* | *63* | *-0.33* |

Total    $1,278,086

60.    Defendants may seek to explain that they offered higher cost share classes with higher fee burdens by pointing to the Plan's ability to use those fees for revenue sharing arrangements.  But this does not justify the increased fees and lost returns imposed on Plan participants.  Rather, empirically speaking, revenue sharing burdens on mutual fund investors are *always* more costly than the revenue sharing credit offered by the corresponding mutual fund share class.

61.    In other words, investing Plan assets in higher cost share classes does not benefit plan participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants.

62.    Because the Plan could have invested in identical mutual funds with a lower cost share class, the Defendants' actions were directly erosive to the trust's growth.

63.    Defendants thus caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on nearly every mutual fund offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

64.    In selecting share classes with higher fees, Defendants demonstrated a lack of basic skill and prudence when selecting investments.

65.    Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants.

66.    Rather, the Plan maintained high-fee share classes and higher fee investments because the excessive plan service provider fees were paid through revenue sharing and fund changes could only be made if they fit within the cost structure imposed by the Plan's recordkeeper.

67.    This caused the Plan to miss out on better returns from lower fee options, to pay variable and indirect excess fees, and to select worse investments based on the Plan's requirements to make indirect payments for the high recordkeeping and service provider fees.

68.    Lastly, the information available for Defendants to make an informed assessment as to costs and returns available for each share class and to make the assessments noted above was made available in each fund's annual prospectus at the time the choices were made.  For example, Defendants have included the Western Asset Core Plus Bond Class A as an investment option available to participants since 2015. The information provided in the Western Asset Core Plus Bond annual prospectuses clearly show a significant difference in fees and investment returns between the Class A and Institutional Share Class.

69.    The Defendants' actions to choose high-cost funds demonstrates a lack of prudence.  The Western Asset Core Plus Bond had an IS or Institutional Share class available with no 12b-1 fees as compared to Class A which the fund invested in that paid twenty-five basis points (0.25%/yr) in 12b-1 fees.  The total fees paid for the Class A share were nearly double at 82 basis points as opposed to 42 basis points for the institutional share.

70.    The Defendants selected the "A" share classes that cost 0.82%/yr because, as per Defendants' Form 5500s, "MassMutual received estimated 12b-1 Fees of 0.25% with respect to plan assets held in the Western Asset Core Plus Bond Fund (MR-2285)."

SECOND AMENDED CLASS ACTION COMPLAINT

71.     In other words, Defendants caused Plan participants who invested in the Western Asset Core Plus Bond to pay nearly double the amount in fees and permitted MassMutual to collect a portion of those increased fees.

72.     Additionally, an analysis of each attribute of the different share classes reveals that there is <u>no</u> difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.

73.     Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs."  Uniform Prudent Investor Act (the "UPIA") §7.

74.     As is evident from the allegations in the Complaint, Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by the offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available.

75.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.   The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in over a million dollars in damages to participants.

**C.     Defendants Paid MassMutual and MSSB Unreasonable Fees and Failed to Monitor MassMutual and MSSB, and Failed to make Requests for Proposals from Other Covered Service Providers.**

76.     Defendants have a duty to prudently select covered service providers

("CSPs"). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation.  Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[3] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess . . . the reasonableness of the fees charged in light of the services provided." *Id*.

77.    Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

78.    Recordkeepers for defined contribution plans can be compensated in multiple ways, including through direct payments from the plan (participants) or employer or through indirect payments via a practice known as revenue sharing.

79.    In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include: Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of Fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

80.    Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper

---

[3] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids.  Defendants did not do that here.

81.    Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable recordkeeping fees. To put it another way, recordkeepers (or any other CSP) receiving unchecked revenue sharing compensation accrue significant ongoing pay increases simply as a result of participants putting money aside biweekly for retirement. Additional funds come from interest, dividends and capital gains.

82.    Based on the number of Plan participants and the assets in the Plan, a reasonable recordkeeping fee for the Plan would have been approximately $40 per participant (15th Annual NEPC 2020 Defined Contribution Plan & Fee Survey: https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20 Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf.    In other words, the appropriate amount for the Plan to pay for recordkeeping services may have been $40 per participant or another amount subject to proof at trial.

83.    This per participant recordkeeping fee would then have been charged to the Plan participants in an appropriate amount based on the assets in each participant's account or through another tiered or graduated structure such that participants paid reasonable fees based on their amount invested in the Plan.

84.    Commencing in 2011, Defendants chose MassMutual to serve as the Plan's recordkeeper.

SECOND AMENDED CLASS ACTION COMPLAINT

85.    Based on the Cost and Revenue Disclosures produced by Defendants, the combined direct and indirect (through revenue sharing) recordkeeping fees paid to Defendants far exceeded a reasonable amount of compensation for recordkeeping and other service provider fees.





86.    There are numerous recordkeepers in the marketplace who are capable

SECOND AMENDED CLASS ACTION COMPLAINT

1   of providing a high level of service to the Plan, and who will readily respond to a
2   request for proposal.

3       87.     The package of recordkeeping services the Plan received included
4   standard recordkeeping services such as: government reporting services, plan
5   sponsor support services, recordkeeping services, and plan investment services and
6   reporting.

7       88.     The Plan did not receive any unique services or at a level of quality that
8   would warrant fees greater than the competitive fees that would be offered by other
9   providers.

10      89.     Recordkeeping    services   are   largely   standardized   because   the
11  recordkeepers must provide these services at scale to a large number of plans and
12  must comply with regulatory requirements.  They cannot offer bespoke sets of
13  services to each individual plan.

14      90.     The bulk of the fee paid for recordkeeping services pays for core
15  recordkeeping services that do not vary from plan to plan.

16      91.     For large plans like this Plan, recordkeeping services are offered in a
17  bundle with standardized services including, but not limited to, recordkeeping,
18  transaction processing, participant communications, plan document services to
19  ensure compliance with new legal and regulatory requirements, plan consulting
20  services including regarding investment selection, accounting and audit services such
21  as Form 5500 preparation, and compliance support and testing.

22      92.     Some other services may be added on an ad-hoc basis including, loan
23  processing, brokerage services, distribution services, and processing of qualified
24  domestic relations orders but the addition of such services do not have a dramatic
25  impact on the cost of recordkeeping services, if any, and would not explain the
26  variable and excessive compensation received by MassMutual that was not tied to
27  the specific services rendered.

28

SECOND AMENDED CLASS ACTION COMPLAINT

93.     Here, the Administrative Services Agreement between MassMutual and the Plan confirms that Alorica received the types of services listed above and did not receive unique services from MassMutual.

94.     This package of standard services could have been provided at lower rates by other recordkeepers.

95.     In this regard, the market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like Alorica's with thousands of participants and a large amount of assets.

96.     Numerous plans with similar numbers of participants paid far less in recordkeeping fees on a per participant basis as demonstrated in the chart below.

| Participants w/ Account Balances | Plan Name | Cost per Participant w/ Balances |
|---|---|---|
| 3,466 | CHI MANAGEMENT GROUP LP | $40.48 |
| 4,445 | SPIRIT AIRLINES INC | $41.38 |
| 5,257 | BEN E KEITH COMPANY | $43.50 |
| 3,759 | PRIVATE NATIONAL MORTGAGE ACCEPTANCE COMPANY LLC | $49.86 |
| 4,273 | SCHNUCK MARKETS INC | $50.43 |
| 5,085 | ONESMILE LLC | $56.84 |
| 5,017 | USIC LLC | $57.78 |
| 5,396 | HFT HOLDINGS INC | $58.39 |
| 4,349 | PAYCOM PAYROLL LLC | $60.42 |
| 3,051 | TRANSDEV NORTH AMERICA INC | $61.78 |
| 4,475 | AGILITI HEALTH INC | $61.87 |
| 3,908 | BLATTNER HOLDING COMPANY | $63.40 |
| 3,646 | RED VENTURES LLC | $69.22 |
| 4,171 | INGLES MARKETS INCORPORATED | $70.24 |
| 3,009 | SERVICE KING PAINT & BODY LLC | $71.28 |
| 3,680 | CHICOS FAS INC | $75.13 |
| **4,045** | **ALORICA** | **$80.32** |

97.     The unreasonable fees paid to MassMutual through its revenue sharing arrangements directly resulted from Defendants' choice of improper mutual fund share classes and failing to monitor MassMutual.

-24-

98.     The mutual funds paid annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds. The Plan participants realized lower returns on their investments because they paid higher fund operating expenses. Over time, the lost compounded returns exceeds the amount of the revenue sharing fees.

99.     The Plan also paid excessive fees to MSSB which were similarly paid on an asset-basis and out of revenue sharing.

100.    The Plan paid MSSB variable fees which at times reached approximately $150,000.

101.    Indeed, between 2016 and 2017, MSSB's compensation rose from ~$85,000 to over $131,000 purely based on the increase in plan assets and not based on the provision of any additional services.



102.    At the time that MSSB's fees increased in this fashion, Alorica did not have any committee overseeing MSSB, which was in effect operating the Plan itself and largely unchecked.

103.    Over the course of the relevant time period, MSSB reduced its asset-based fee from over 10 basis points to under 7 basis points.  Plainly, had Defendants

conducted proper oversight from MSSB at the outset of the relevant time period and sufficiently negotiated its fees, the Plan have paid lower rates to MSSB throughout the relevant time period.

104.  The clear explanation for the Plan overpaying for covered service providers is that Defendants have a flawed and reckless provider selection process that is "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

105.  As previously noted, in most years, 90% or more of the funds offered to the participants had less expensive share classes available.  Defendant's use of higher cost share classes to pay service provider costs is the most inequitable, inefficient and expensive method available.

106.  Defendants clearly failed to use the Plan's bargaining power to leverage its CSPs to charge lower administrative fees for the Plan participants.

107.  Defendants failed to take any or adequate action to monitor, evaluate or reduce MassMutual or MSSB's fees, such as:

    a.  Choosing mutual fund share classes with lower revenue sharing for the Plan;

    b.  monitoring costs to compare with the costs being charged for similar sized plans in the marketplace; or

    c.  negotiating with MassMutual to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan.

108.  In 2022 when MassMutual was acquired by Empower and Defendants performed an RFP for recordkeeping services.

109.  Defendants had been paying over 20 basis points of plan assets to MassMutual during prior years.

110.  Defendants obtained several quotes from recordkeeping service providers in response to their RFPs and none of the quotes came close to the high level of fees that the Plan had been paying to MassMutual.

SECOND AMENDED CLASS ACTION COMPLAINT

111.   Indeed, Defendants received a quote from Empower in response to their RFP for recordkeeping services to keep the existing plan lineup that the Plan had with MassMutual at a much lower cost of 13 basis points or $49 per person.

112.   Defendants were able to obtain an even lower rate of 10 basis points per person for recordkeeping services from Merrill Lynch (Bank of America) and Defendants switched the Plan to Merrill Lynch for recordkeeping services in October of 2022.

113.   Had Defendants taken the same affirmative steps to reduce plan recordkeeping fees during the prior years, they could have reduced recordkeeping fees throughout the relevant time period.

114.   Instead, the Defendants kept efforts to obtain lower recordkeeping fees through a competitive RFP process on the back burner and the Plan paid its CSPs amounts that vastly exceeded any DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit."

115.   In sum, the Plan unreasonably paid broker dealer intermediaries like MassMutual and MSSB fees far in excess of what the Plan needed to pay for their services and these fees were not tethered to the actual services rendered, but rather increased based on revenue sharing of a larger corpus of Plan funds over time.

116.   Additionally, as discussed in more detail below, the Plan suffered return losses because it was locked into high-fee share classes and investments in order to pay the excessive compensation to its service providers through revenue sharing.

117.   ERISA holds fiduciaries "to a high standard of care and diligence" regarding fees: Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices." Additionally, The Department of Labor has consistently reminded ERISA fiduciaries

of their responsivities to carefully evaluate fees when selecting plan investment options and then monitor fees on an ongoing basis.  Defendants breached their fiduciary duties by failing to conduct themselves accordingly.

**D.  Defendants Selected and Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care.**

*1. Defendants Chose and Continued to Include Investments Lagging in Benchmark Comparisons.*

*a. Defendants selected and retained funds that performed poorly and for which the costs of active management were not justified.*

118.  Mutual funds charge investors manager fees (ranging from 0.5%/yr to 1%/yr) that ostensibly pay for the premium of skilled human managers choosing investments which are meant to perform better than their benchmarks.  The funds also pay costs that are incurred because of their active turnover of investments (ranging per U.S. Securities and Exchange Commission (SEC) from 1%/yr to 1.5%/yr).

119.  Unlike mutual funds with human managers, passive or index funds have no manager fees or transaction/turnover costs to detract from the funds' performance.

120.  The Restatement of Trusts (Third) explains that a plan fiduciary must not only benchmark the fees of actively managed funds but also identify the additional costs that result from the use of actively managed funds. It is necessary to identify these costs so that the plan sponsor can determine whether the additional costs are justified by a reasonable expectation of additional returns.

121.  Accordingly, in order to justify investment in actively managed funds, those funds must actually perform better than their benchmark.  In other words, the plan managers must demonstrate skill in beating the relevant part of the market to justify fees and costs of active investment.

122.  This statistical concept is fundamental and considers the tenet of

1  investing that more risk must be justified by higher potential returns while less risk

2  may be met with lesser returns. Indeed, the Restatements of Trust (Second and

3  Third) discuss why Treasury bills and notes are bought by older investors – less

4  yield, but less risk to for someone with little time to recover losses. When the higher

5  level of risk fails to achieve a commensurate level of higher return, the investment

6  cannot be prudent.

7      123.   That is, "[i]f the extra costs and risks of an investment program are

8  substantial, these added costs and risks must be justified by realistically evaluated

9  return expectations." Restatement (Third) of Trusts § 90, cmt. H(2).    In the

10  investment industry, this comparison must be made by comparing the performance

11  of actively managed funds to the performance of broad market indexes and index

12  fund alternatives. The use of actively managed funds is justified only when the

13  additional expected returns sufficiently exceed the known additional costs.

14      124.   Many studies have shown that while higher-cost mutual funds may over

15  the short term outperform a less-expensive option, such as a passively managed

16  index fund, they rarely do so over an extended period of time.

17      125.   For the funds made available by Defendants for Plan participants,

18  Plaintiffs have calculated each actively managed fund's returns versus the

19  performance of their benchmark. Plaintiffs tested each of Defendants' chosen

20  stock/bond selection skill (at a 95% confidence level). This comparison used the

21  specific periods of time used by the Defendants (at the time of their adding a fund) to

22  ensure Plaintiffs never reviewed the Defendants' conduct using hindsight.

23      126.   Plaintiffs used this mathematical evidence-based analysis to analyze

24  whether it was prudent to add/retain actively managed funds.

25      127.   The first step in this calculation is determining the manager's excess

26  returns above an appropriate benchmark. Then, the regularity of the excess returns is

27  calculated using the standard deviation of those returns. Based on these two

28

numbers, Plaintiffs calculated the length of time (number of years) needed to observe whether a manager can support their skill claim can be determined.

128. The following table contains a list of funds chosen/retained by Alorica represents funds over a 12- year time period. At any one plan year, only about two dozen fund choices were available to participants/beneficiaries for (1) saving their salaries biweekly and (2) reinvesting their interest, dividends and capital gains monthly.

129. The table demonstrates that almost none of the funds selected by Defendants can be justified by the fund's performance relative to market indices.

130. For example, the Principal Large Cap S&P 500 Index R1 was the most expensive fund share class available to the Defendants and the manager of the fund lagged behind his benchmark's return by (1.07%) every year before Defendants selected the fund for the trust. As seen in the table, the fund did not demonstrate the requisite skill to justify its inclusion because there was no likelihood that it would outperform its benchmark and justify the payment of additional fees and costs.

131. The next fund in row two of the table, the American Funds Growth Fund of Amer R1, was the most expensive fund share class available to the Defendants at the time of their conduct (adding the fund to the trust) and the fund manager would require 41 years of monitoring to determine whether he had skill at a 95% confidence level (based on his returns versus benchmark's performance for every earlier year of the fund's existence). Alorica's fund's inception date was June 6, 2002. Accordingly, the selection and retention of this fund cannot be justified by performance analysis compared to the relevant benchmark.

132. Moreover, as noted, in most instances, Defendants unjustifiably selected a costly share class when a less costly class was available.

133. Defendants had a duty not to select these funds and a continuing duty to cull the funds from the investment portfolio.

-30-

SECOND AMENDED CLASS ACTION COMPLAINT

| Fund chosen by Alorica | Alorica chose costly share class (Y/N) | #yrs to monitor mgr |
|---|---|---|
| Principal Large Cap S&P 500 Index R1 | YES | no skill |
| American Funds Growth Fund of Amer R1 | YES | 41 |
| American Funds Washington Mutual R1 | YES | no skill |
| Principal MidCap S&P 400 Index R1 | YES | 445 |
| Principal SmallCap S&P 600 Index R1 | YES | no skill |
| American Century Small Cap Growth C | YES | no skill |
| Principal SmallCap Value II R1 | YES | 788,367 |
| American Funds Europacific Growth R1 | YES | no skill |
| Templeton Developing Markets C | YES | no skill |
| Principal Real Estate Securities R1 | YES | 1 |
| Calvert Bond C | YES | no skill |
| Principal LifeTime 2010 R1 | YES | no skill |
| Principal LifeTime 2020 R1 | YES | no skill |
| Principal LifeTime 2030 R1 | YES | no skill |
| Principal LifeTime 2050 R1 | YES | no skill |
| Principal LifeTime Strategic Inc R1 | YES | no skill |
| JHancock US Global Leaders Growth I | NO | no skill |
| Wells Fargo Special Small Cap Value Adm | YES | no skill |
| Invesco Oppenheimer International Gr A | YES | 69 |
| Janus Henderson Global Equity Income I | NO | 24 |
| PIMCO Real Return Instl | NO | 70 |
| American Funds American Balanced R4 | YES | no skill |
| MassMutual Select Mid Cap Growth Svc | YES | 545 |
| Janus Henderson Glb Tech and Innovt T | YES | 72 |
| MM S&P® Mid Cap Index R5 | YES | 398 |
| MM MSCI EAFE® International Index R5 | YES | no skill |
| ClearBridge International Growth I | NO | no skill |
| Western Asset Core Plus Bond A | YES | 4 |
| MassMutual Premier High Yield Svc | YES | no skill |
| MM S&P® Mid Cap Index R5 | YES | 10,431 |
| PGIM Jennison Mid-Cap Growth Z | NO | 369 |

SECOND AMENDED CLASS ACTION COMPLAINT

134.   In addition to demonstrating that Defendants' selection and retention of actively managed funds was not justified by performance, Plaintiffs have also compared the actively managed funds to passively managed funds invested in the same asset class – a standard industry practice for evaluating mutual funds.

135.   As shown in the next table, the Plan spent close to an additional $5.5 million chasing excess returns. While a few funds may have outperformed passive funds despite excessive fees over limited time periods, overwhelmingly the suite of funds as a whole underperformed primarily due to the excessive fees and lack of skill in managing the funds. Because Defendants did not have a viable methodology for identifying fund managers with the skills necessary to outperform the market, almost $5.5 million was wasted.  As explained above, these losses compound over time.

136.   Defendant Alorica failed its fiduciary duty by setting up an investment structure that does not properly consider lower cost, higher performance investment options.

137.   The costs to the Alorica 401(k) Retirement Plan are estimated in the following chart using the Defendants' Forms 5500 and the U.S. Securities and Exchange Commission (SEC) transaction costs estimates:



SECOND AMENDED CLASS ACTION COMPLAINT

138.   Plaintiffs have analyzed some of the key funds that Defendants selected for the Plan, including those with the largest investments of participants' assets.  As explained below, their performance prior to and after selection did nothing to justify their selection and retention, both as compared to active funds and passive comparators with the same investment utility and similar holdings.

139.   The chart below compares these key mutual funds and demonstrates that they could have been replaced with comparable index funds with lesser fees and better overall performance.

**Current vs Replacement Index Funds**

| Begin Date | End Date | Plan Fund | Expense | Comparable Index Fund | Expense | Excess Expense | Total Return Lag (%) During SOL | Total Return Lag ($)* During SOL |
|---|---|---|---|---|---|---|---|---|
| 5/6/2019 | 9/30/2022 | MM S&P 500® Index R5 | 0.21% | Fidelity® 500 Index | 0.015% | 1300% | -0.87% | -129,791 |
| 11/15/2016 | 9/30/2022 | JHancock US Global Leaders Growth I | 0.88% | Vanguard Growth Index Adm | 0.05% | 1660% | -17.95% | -1,506,532 |
| 10/12/2016 | 9/30/2022 | MassMutual Select Growth Opps Svc | 0.95% | Vanguard Growth Index Adm | 0.05% | 1800% | -52.86% | -557,452 |
| 10/12/2016 | 6/30/2021 | Delaware Value® Inst | 0.68% | Vanguard Value Index Adm | 0.05% | 1260% | -24.82% | -866,920 |
| 10/12/2016 | 6/30/2021 | Invesco Diversified Dividend A | 0.81% | Vanguard Value Index Adm | 0.05% | 1520% | -45.98% | -532,585 |

**Total:  3,593,280**

\* Lag ($) were calculated based on applying the lag (%) to the 2016 beginning year assets (or year they were added if during the limitations period (SOL) for each fund and are intended to illustrate the cost of not switching to passively managed funds earlier

140.   The comparators used in the chart above are appropriate because they, *inter alia*, are widely available and reputable funds, have the same investment goals as their comparator funds, select stocks out of the same pools, and in some instances were the selected replacements by the Plan when service provider fees were reduced.

In 2021, the Plan replaced the Delaware Value with the Vanguard Value Index Admiral Fund. In 2022, the Plan replaced the MassMutual S&P 500 Index fund with the Fidelity 500 Index fund. The Vanguard Growth Index Admiral was also added to the Plan in 2021 and Defendants appear to have mapped assets from the John Hancock US Global Leaders Growth fund to that fund in 2022.

141. All of the comparators above would be used by Plan participants looking to make the same kind of investments as the comparator Plan investment.

142. In this regard, the MassMutual S&P 500 index fund held by the fund is identical to the Fidelity fund that Plaintiffs have compared it to other than having higher fees. Both funds are designed to track the performance of the S&P 500.

143. As to the active funds, 29 CFR § 2550.404a-5(d)(1)(iii) requires fiduciaries to provide plan participants a comparison of fund investments with "[b]enchmarks" comparing performance to "an appropriate broad-based securities market index."

144. SEC rules similarly require mutual funds to compare their performance to "an appropriate broad-based securities market index."[4]

145. The passive funds selected by Plaintiffs for comparison are appropriate comparators to the active funds because they could both properly be benchmarked against the same broad-based market index comparators within the meaning of 29 CFR § 2550.404a-5 and relevant SEC rules.

146. The JHancock US Global Leaders Growth I and MassMutual Growth Opps Svc funds offered by the plan and the passively managed comparator Vanguard Growth Index fund all seek similar opportunities within the largest growth-oriented companies. The Vanguard Growth Index fund was ultimately selected by the Defendants as a replacement fund.

---

[4] *See* https://www.sec.gov/files/formn-1a.pdf

SECOND AMENDED CLASS ACTION COMPLAINT

147.   The Delaware Value® and Invesco Diversified Dividend are compared to the passively managed Vanguard Value Index Adm because they all seek to invest in stocks of large U.S. companies (market value >$10 billion) whose intrinsic value is greater than the current market value of the stock.

148.   Plaintiffs selected the MM S&P 500® Index fund for analysis because the plan held almost $20M of participants' assets. This represents the second largest Plan investment in a fund.

149.   The MM S&P 500® Index is an S&P index fund offered by MassMutual, a plan service provider.

150.   Although the fund is one of the few passively managed investments in the fund, it too should and would have been replaced by Plan fiduciaries who had an appropriate process for reviewing plan investments.

151.   That is because Plan fiduciaries should have recognized that this index fund could have been replaced with an index fund that had lower fees but served an identical purpose to investors.

152.   Plan fiduciaries' failure to make that replacement cost Plan participants excess fees which compounded year after year.

153.   Similarly, in 2017, the Defendants caused financial harm to the Plaintiffs by adding the more expensive MassMutual Select Mid Cap Growth Svc. Defendants sold the Plaintiffs' interest in the cheaper Prudential Jennison Mid Cap Growth and forced their money into the pricier MassMutual Select Mid Cap Growth fund. This sale from the cheaper fund to the more expensive fund cost Plaintiffs meant more costs for the Plaintiff for a very similar asset class funds for the years 2017 through 2021.  If Defendants had evaluated the selection decision as a prudent investor in a similar situation had, they would have known that each fund's expense ratio and turnover costs are inverse predictors of future performance; the lower the manager fee/turnover, the higher the expected return. Had the Defendants kept the

SECOND AMENDED CLASS ACTION COMPLAINT

old fund, the trust would have almost $1 million more dollars in it since the decision to transfer Plan assets into a more expensive MassMutual fund in 2017.

154.   Plaintiffs selected the JHancock US Global Leaders Growth fund for analysis because as of 2020, the Plan had over $22M of participants' funds invested in the fund.  This represents the largest investment of Plan assets in a fund, second only to the stable value guaranteed income investment which also holds over $22M in investment funds.

155.   The fund should not have been selected as it trailed its Morningstar peers in six of eleven years prior to selection including five years in the lowest quartile of performance.   Additionally, as discussed above, analysis of its performance at the time of selection would have led to the conclusion that its manager did not have skill that justified its fees over investment in a passive option.

156.   Since selection, as shown above, its return has lagged its passive comparator.  There is no justification for the Plan's continued retention of this fund.

157.   Plaintiffs selected the MassMutual Growth Opps fund for analysis because it was the only additional large growth option fund next to the JHancock US Global Leaders Growth fund discussed above.

158.   As demonstrated in the chart above, this fund offered a staggering 57.26% worse performance than its passive fund comparator over the six-year period ending December 31, 2021.   It has performed worse than its Morningstar comparators in four out of the last seven years and it should have been removed from the Plan.

159.   Plaintiffs selected the Delaware Value® fund for analysis because together with the Invesco Diversified Dividend fund they represent the two large value fund options in the Plan.

160.   They have both performed poorly.

161.   The Delaware Value® fund's return lags its Morningstar comparators in five of the seven years since its selection and its performance has caused a 24% loss

to the plan compared to its passive comparator in the six-year period ending December 31, 2021.

162. Additionally, as discussed above, analysis of its performance at the time of selection would have led to the conclusion that its manager did not have skill that justified its fees over investment in a passive option.

163. The Invesco Diversified Dividend fund was outperformed by its Morningstar comparators in five of the nine years prior to its selection and six of nine years since selection. It caused a 40.89% loss to the plan compared to the performance of its passive comparator in the six-year period ending December 31, 2021.

164. Additionally, as discussed above, analysis of its performance at the time of selection would have led to the conclusion that its manager did not have skill that justified its fees over investment in a passive option.

165. The American Funds Capital World Gr&Inc fund has trailed its Morningstar peers in 7 of 10 years since selection and there is no justification for the Plan's continued retention of this fund.

166. Additionally, as discussed above, analysis of its performance at the time of selection would have led to the conclusion that its manager did not have skill that justified its fees over investment in a passive option.

167. Defendants' failure to engage in appropriate prudent selection and retention decision making processes is further evidenced by the fact that Defendants did not invest any of the actively managed funds discussed above in the best share class that was available to the Plan for those funds, costing Plan participants additional fees on top of the ordinary active fund management fees.

168. Thus, as demonstrated above, even if offering actively managed funds can be justified in some instances, here it was not justified by Defendants' specific Plan investment choices.

169.   Moreover, Defendants did not offer sufficient passive and index funds for investors who prudently did not want to pay excess fees chasing returns.

170.   Defendants began offering an S&P Index Fund in 2011.  They offered another passive fund beginning in 2017, and two more in 2019.  But these funds did not offer sufficient investment choices for those Plan participants who prudently did not want to pay excess fees for funds whose performance did not justify those fees.

171.   Moreover, three of the four passively managed funds were proprietary MassMutual products that still had significantly higher fees than comparable passive fund alternatives.

172.   Thus, Defendants never offered Plan participants an opportunity to invest their funds in a diversified, low-fee approach.

173.   Finally, these funds did not merely trail passively managed options, but trailed their benchmarks as well as discussed in more detail in the section below.

174.   Defendants had a duty to prudently select funds and not to chase excess returns which were not justified by the performance of the funds at the time of their selection or thereafter.  Defendants had a duty to seek out lower cost comparable funds than those that they offered.

175.   Defendants were aware of the year over year and overall performance discussed above and had a duty to make appropriate selection decisions and *actively cull underperforming funds* whose continued inclusion in the Plan could not be justified and which were costing Plan participants excess fees that were not justified by performance.

176.   During the Class Period, Defendants failed to consider and monitor materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

177.   As discussed above, the Plan was locked into high fee funds because it was using the revenue from these funds to pay excessive compensation to its service

SECOND AMENDED CLASS ACTION COMPLAINT

providers.  Had Defendants acted to reduce Plan service provider costs, it would have allowed them to obtain lower fee and better performing funds for the Plan.

178.   Defendants breached their duties and continue to do so by failing to remove mutual funds which charge fees that are not justified by their performance.

**b.  *Defendants selected and retained funds that performed poorly as compared to their self-selected benchmarks and Morningstar calculated benchmarks.***

179.   As discussed above, mutual fund portfolio managers choose a benchmark index to use in their prospectus as a comparison for evaluating fund performance often referred to as the Primary Prospectus Benchmark ("PPBM").

180.   However, in addition to the PPBM selected by the fund managers themselves, third parties may provide additional appropriate comparators for each fund.

181.   Morningstar, Inc. ("Morningstar") is one such third party and a respected financial services company that provides research and analytics that are used throughout the asset management industry.

182.   In 1996, Morningstar created category classifications to help investors make meaningful comparisons between mutual funds.

183.   In order to provide a measure of fund performance, Morningstar publishes data on each fund's performance compared to Morningstar selected benchmarks.

184.   First, the Morningstar Category Index ("MCI") is a category specific index that allows investors and advisors to compare fund performance to benchmarks that may be a better fit to the true makeup of a fund than the fund-selected PPBM.

185.   MCIs are commonly used as comparators in investment selection, monitoring and reporting tools used by investment managers and 401(k) investment committees.  MCI comparisons can be beneficial because they typically represent the weighted returns of the vast majority of investments within a specific asset-class (i.e. large-cap growth or small-cap value) which allows those selecting and monitoring

SECOND AMENDED CLASS ACTION COMPLAINT

1  investments to better identify risk and return derivations between the mutual funds

2  they are reviewing.

3      186.  Second, Morningstar selects a Best-Fit Index ("BFI") for each fund

4  based on the composition of the fund over the prior 36-month period.[5]  Because the

5  fund is highly correlated to its BFI, comparison of a fund to its BFI makes it is easier

6  to determine how much of a fund's movements are based on the movements of the

7  index, the relative level of risk a portfolio manager is taking, and ultimately whether

8  a portfolio manager is adding value.

9      187.  The MCI and BFI are strong comparators and useful tools for evaluating

10  fund performance because portfolio managers of funds with the same investment

11  purpose make buy and sell decisions based on the same pool of investments (stocks

12  and/or bonds). These benchmarks help investors determine whether a specific

13  portfolio manager has skill determining within that pool and how much to

14  over/underweight certain investments and when to buy and sell.

15      188.  When evaluating fund performance, a prudent fiduciary considers data

16  on a fund's performance against all relevant benchmarks including its MCI and BFI

17  when evaluating fund performance because those comparators evaluate whether the

18  fund is performing well based on the actual purpose and design of the fund.

19      189.  Here, as demonstrated in the tables below, many of the funds (including

20  those discussed in the prior section) offered by the Plan have shown poor

21  performance during the statutory period as compared to their MCI and BFI and their

22  self-selected benchmarks (PPBM) and in almost all cases have trailed these measures

23  when looking at the fund from the time it was selected causing losses to the Plan.

24

25

26

27

28

---

[5] *Id.*

1
2
3
**Challenged Funds' Cumulative Returns
vs Prospectus Benchmark**
4
5
6
7

| Year Selected | Last Full Year in the Plan | Fund Name | Primary Prospectus Benchmark (PPBM) | +/- PPBM Prior to Selection[1] | +/- PPBM since Selection[2] | +/- PPBM during SOL Period[3] | Cost to Participants during SOL Period[4] |
|---|---|---|---|---|---|---|---|
| 2011 | 2019 | MM S&P 500 Index Svc | S&P 500 TR USD | (2.26) | (9.69) | (1.37) | ($35,693) |
| 2011 | 2022 | MM S&P 500 Index R5 | S&P 500 TR USD | (2.26) | (9.69) | (0.87) | ($137,411) |
| 2016 | 2022 | JHancock US Global Leaders Growth I | Russell 1000 Growth TR USD | (15.15) | (33.89) | (30.50) | ($2,560,405) |
| 2012 | 2022 | MassMutual Growth Opps Svc | Russell 1000 Growth TR USD | 16.54 | (142.50) | (67.94) | ($716,479) |
| 2015 | 2020 | Delaware Value Inst | Russell 1000 Value TR USD | 19.10 | (1.08) | (15.10) | ($527,324) |
| 2013 | 2022 | Invesco Diversified Dividend A | Russell 1000 Value TR USD | 12.15 | (20.74) | (20.78) | ($240,689) |
| 2017 | In Plan | MassMutual Mid Cap Growth Svc | Russell Mid Cap Growth TR USD | 32.16 | (7.18) | (7.45) | ($124,543) |
| 2017 | In Plan | Columbia Small Cap Index Inst2 | S&P SmallCap 600 TR USD | (3.18) | (1.75) | (1.25) | ($664) |
| 2016 | 2018 | Invesco Oppenheimer International Growth A | MSCI ACWI Ex USA NR USD | 47.54 | (14.53) | (5.05) | ($72,802) |
| 2016 | In Plan | Janus Henderson Global Equity Income I* | MSCI World NR USD | - | (38.68) | (35.49) | ($164,795) |
| 2011 | In Plan | Invesco Developing Markets Y | MSCI EM NR USD | 151.59 | 4.18 | (9.14) | ($51,719) |
| 2011 | In Plan | American Funds Capital World G/I R4 | MSCI ACWI NR USD | 74.33 | (3.44) | (11.61) | ($133,584) |
| 2020 | 2020 | Invesco Real Estate Y | S&P 500 TR USD | (67.17) | (28.98) | (28.98) | ($116,875) |
| 2015 | In Plan | MassMutual High Yield Svc | Bloomberg US Corporate High Yield TR USD | (6.94) | (0.49) | (1.63) | ($23,426) |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2011 | 2019 | JPMorgan SmartRetirement Income A | S&P Target Date Retirement Income TR USD | - | (0.09) | (0.65) | ($2,879) |
| 2011 | 2019 | JPMorgan SmartRetirement 2020 A | S&P Target Date 2020 TR USD | - | (5.75) | (3.91) | ($99,252) |
| 2011 | 2019 | JPMorgan SmartRetirement 2030 A | S&P Target Date 2030 TR USD | - | (2.82) | (1.88) | ($97,425) |
| 2011 | 2019 | JPMorgan SmartRetirement 2040 A | S&P Target Date 2040 TR USD | - | (3.90) | (1.11) | ($61,786) |
| 2015 | 2019 | JPMorgan SmartRetirement 2050 A* | S&P Target Date 2050 TR USD | - | (7.61) | (3.13) | ($23,161) |

* assets from the year after selection                                                                      ($5,155,219.44)

1) Ten years ending the year prior to selection
2) Since selection is based on year selected through
the last full year held in the plan
3) Beginning period based on first year it was in the plan, if later than
2016. Ending year based on last full year in the plan
4) 2016 beginning year assets or of the year fund
was added if later

**Challenged Funds' Cumulative Returns
vs Best Fit Index**

| Year Selected | Last Full Year in the Plan | Fund Name | Best-Fit Index (BFI) | +/- BFI Prior to Selection[1] | +/- BFI since Selection[2] | +/- BFI during SOL Period[3] | Cost to Participants during SOL Period[4] |
|---|---|---|---|---|---|---|---|
| 2011 | In Plan | MM S&P 500 Index Svc | S&P 500 TR USD | (2.26) | (9.69) | (1.37) | ($35,692.79) |
| 2011 | In Plan | MM S&P 500 Index R5 | S&P 500 TR USD | (2.26) | (9.69) | (0.87) | ($137,411.11) |
| 2012 | In Plan | MassMutual Growth Opps Svc | Russell Mid Cap Growth TR USD | (21.66) | (52.59) | (22.53) | ($237,595.97) |
| 2015 | 2020 | Delaware Value Inst | Morningstar US LM Brd Val TR USD | 15.74 | (18.48) | (26.36) | ($920,547.35) |
| 2013 | In Plan | Invesco Diversified Dividend A | Russell 1000 Value TR USD | 12.15 | (20.74) | (20.78) | ($240,689.34) |
| 2017 | In Plan | MassMutual Mid Cap Growth Svc | Morningstar US Mid Brd Grt TR USD | 35.53 | (10.84) | (13.10) | ($218,995.06) |
| 2009 | 2019 | American Funds EuroPacific Growth R4 | Morningstar Gbl xUS Growth TME NR USD | - | 13.37 | (3.57) | ($83,790.86) |

-42-

SECOND AMENDED CLASS ACTION COMPLAINT

| | Year | Last Full Year | Fund Name | Morningstar Category Index (MCI) | +/- MCI Prior to Selection | +/- MCI since Selection | +/- MCI during SOL Period | Cost to Participants during SOL Period |
|---|---|---|---|---|---|---|---|---|
| 1-2 | 2016 | 2018 | Invesco Oppenheimer International Growth A | Morningstar Gbl Allocation TR USD | 11.89 | (18.84) | (1.01) | ($14,560.30) |
| 3-4 | 2016 | In Plan | Janus Henderson Global Equity Income I* | MSCI ACWI Value NR USD | - | (19.29) | (8.26) | ($38,354.65) |
| 5 | 2011 | In Plan | Invesco Developing Markets Y | MSCI EM NR USD | 151.59 | 4.18 | (9.14) | ($51,718.78) |
| 6-7 | 2011 | In Plan | American Funds Capital World G/I R4 | Morningstar Gbl TME NR USD | 42.57 | 1.46 | (11.76) | ($135,309.97) |
| 8 | 2020 | 2020 | Invesco Real Estate Y | Morningstar US Real Est TR USD | (12.15) | (6.38) | (6.38) | ($25,730.22) |
| 9-10 | 2015 | In Plan | MassMutual High Yield Svc | ICE BofA US High Yield TR USD | (11.83) | 0.64 | (0.88) | ($12,647.38) |
| 11 | 2011 | 2019 | JPMorgan SmartRetirement Income A | Morningstar Mod Con Tgt Risk TR USD | - | (37.44) | (6.57) | ($29,102.41) |
| 12-13 | 2011 | 2019 | JPMorgan SmartRetirement 2020 A | Morningstar Mod Con Tgt Risk TR USD | - | (26.62) | (2.18) | ($55,337.36) |
| 14-15 | 2011 | 2019 | JPMorgan SmartRetirement 2030 A | Morningstar Gbl Allocation TR USD | - | (14.54) | (0.04) | ($2,072.86) |
| 16-17 | 2011 | 2019 | JPMorgan SmartRetirement 2040 A | MSCI ACWI NR USD | - | (5.94) | (9.14) | ($508,761.74) |
| 18 | 2015 | 2019 | JPMorgan SmartRetirement 2050 A* | Morningstar Gbl TME NR USD | - | (6.02) | (8.87) | ($65,634.01) |
| 19 | | | | | | | | ($2,778,259.37) |

* assets from the year after selection

1) Ten years ending the year prior to selection
2) Since selection is based on year selected through the last full year held in the plan
3) Beginning period based on first year it was in the plan, if later than 2016. Ending year based on last full year in the plan
4) 2016 beginning year assets or of the year the fund was added if later

**Challenged Funds' Cumulative Returns vs Morningstar® Category Index**

| Year Selected | Last Full Year in the Plan | Fund Name | Morningstar Category Index (MCI) | +/- MCI Prior to Selection[1] | +/- MCI since Selection[2] | +/- MCI during SOL Period[3] | Cost to Participants during SOL Period[4] |
|---|---|---|---|---|---|---|---|
| 2011 | In Plan | MM S&P 500 Index Svc | Russell 1000 TR USD | (7.05) | (2.33) | (1.21) | ($31,524.29) |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2011 | In Plan | MM S&P 500 Index R5 | Russell 1000 TR USD | (7.05) | (2.33) | 0.36 | $56,859.77 |
| 2016 | In Plan | JHancock US Global Leaders Growth I | Russell 1000 Growth TR USD | (15.15) | (33.89) | (30.50) | ($2,560,405.16) |
| 2012 | In Plan | MassMutual Growth Opps Svc | Russell 1000 Growth TR USD | 16.54 | (142.50) | (67.94) | ($716,478.93) |
| 2015 | 2020 | Delaware Value Inst | Russell 1000 Value TR USD | 19.10 | (1.08) | (15.10) | ($527,324.16) |
| 2013 | In Plan | Invesco Diversified Dividend A | Russell 1000 Value TR USD | 12.15 | (20.74) | (20.78) | ($240,689.34) |
| 2017 | In Plan | MassMutual Mid Cap Growth Svc | Russell Mid Cap Growth TR USD | 32.16 | (7.18) | (7.45) | ($124,542.99) |
| 2009 | 2019 | American Funds EuroPacific Growth R4 | MSCI ACWI Ex USA Growth NR USD | - | 3.63 | (5.67) | ($133,079.61) |
| 2016 | 2018 | Invesco Oppenheimer International Growth A | MSCI ACWI Ex USA Growth NR USD | 37.41 | (13.59) | (11.27) | ($162,469.90) |
| 2011 | In Plan | Invesco Developing Markets Y | MSCI EM NR USD | 151.59 | (12.69) | (9.14) | ($51,718.78) |
| 2011 | In Plan | American Funds Capital World G/I R4 | MSCI ACWI NR USD | 74.33 | (3.44) | (11.61) | ($133,584.08) |
| 2020 | 2020 | Invesco Real Estate Y | S&P United States REIT TR USD | (15.29) | (3.06) | (3.06) | ($12,340.83) |
| 2015 | In Plan | MassMutual High Yield Svc | ICE BofA US High Yield TR USD | (11.83) | 0.64 | (0.88) | ($12,647.38) |
| 2011 | 2019 | JPMorgan SmartRetirement Income A | Morningstar Lifetime Mod Incm TR USD | - | (1.42) | (1.51) | ($6,688.68) |
| 2011 | 2019 | JPMorgan SmartRetirement 2020 A | Morningstar Lifetime Mod 2020 TR USD | - | (6.56) | (6.50) | ($164,996.72) |
| 2011 | 2019 | JPMorgan SmartRetirement 2030 A | Morningstar Lifetime Mod 2030 TR USD | - | (6.60) | (4.31) | ($223,351.18) |
| 2011 | 2019 | JPMorgan SmartRetirement 2040 A | Morningstar Lifetime Mod 2040 TR USD | - | (5.94) | (1.04) | ($57,889.74) |
| 2015 | 2019 | JPMorgan | Morningstar | - | (5.89) | (0.04) | ($295.98) |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | SmartRetirement 2050 A* | Lifetime Mod 2050 TR USD | | | | |
|---|---|---|---|---|---|---|---|

* assets from the year after selection                                                                ($5,071,643.68)

1) Ten years ending the year prior to selection
2) Since selection is based on year selected through the last full year held in the plan
3) Beginning period based on first year it was in the plan, if later than 2016. Ending year based on last full year in the plan
4) 2016 beginning year assets or of the year the fund was added if later

190.   Defendants were aware of the performance discussed above and had a duty to make appropriate selection decisions and *actively cull underperforming funds* whose continued inclusion in the Plan could not be justified.

191.   Defendants' failure to appropriately remove underperforming funds from the Plan was motivated at least in part by the need to retain high fee funds and MassMutual proprietary funds in order to compensate MassMutual for recordkeeping and otherwise funnel fees towards MassMutual and MSSB.

192.   Defendants breached their duties and continue to do so by failing to remove underperforming mutual funds.

> *2. Defendants maintained higher fee funds which underperformed their lower fee replacements*

193.   As noted, Defendants failure to reign in the Plan's high service provider fees forced the Plan to maintain funds with high fees which would generate the revenue sharing to pay MassMutual and MSSB and Defendants were limited in their choice of investments by MassMutual's requirements.

194.   Thus, for example, when the Investment Committee discussed replacing the JPMorgan Target Date Funds, MSSB advised that switching to the lower cost Vanguard Target Date Funds which did not have revenue sharing would require addition of a separate asset based fee from MassMutual.

195.   Thus, Defendants' failure to obtain reasonable service provider fees harmed the Plan by causing it to invest in both higher fee share classes and higher fee funds during the relevant time period, which underperformed the lower fee funds

with which they were eventually replaced when Merrill Lynch became the Plan recordkeeper and revenue sharing was eliminated in October of 2022.

| Begin Date | End Date | Ticker | Group/Investment | Prospectus Net Expense Ratio | Inception Date | Return (Cumulative) |
|---|---|---|---|---|---|---|
| | | | **US OE Large Blend** | | | |
| 10/12/2016 | 9/30/2022 | MIEZX | MM S&P 500® Index R5 | 0.22 | 4/30/2001 | 84.73 |
| 10/3/2022 | Present | FXAIX | Fidelity 500 Index | 0.02 | 5/4/2011 | 86.96 |
| | | | *Difference* | (0.21) | | (2.22) |
| | | | **US OE Large Growth** | | | |
| 11/15/2016 | 9/30/2022 | USLIX | JHancock US Global Leaders Growth I | 0.88 | 5/20/2002 | 90.21 |
| 10/3/2022 | Present | VIGAX | Vanguard Growth Index Admiral | 0.05 | 11/13/2000 | 108.16 |
| | | | *Difference* | (0.83) | | (17.95) |
| 10/12/2016 | 9/30/2022 | MAGYX | MassMutual Growth Opps Svc | 0.96 | 4/28/2000 | 52.29 |
| 10/3/2022 | Present | JLGMX | JPMorgan Large Cap Growth R6 | 0.44 | 11/30/2010 | 163.10 |
| | | | *Difference* | (0.52) | | (110.81) |
| | | | **US OE Large Value** | | | |
| 10/12/2016 | 6/30/2021 | DDVIX | Delaware Value® Inst | 0.68 | 9/14/1998 | 56.35 |
| 7/1/2021 | Present | VVIAX | Vanguard Value Index Adm | 0.05 | 11/13/2000 | 81.17 |
| | | | *Difference* | (0.63) | | (24.82) |
| 10/12/2016 | 9/30/2022 | DDFIX | Invesco Diversified Dividend R5 | 0.53 | 10/25/2005 | 41.93 |
| 10/3/2022 | Present | JLVMX | JPMorgan Large Cap Value R6 | 0.44 | 11/30/2010 | 78.40 |
| | | | *Difference* | (0.09) | | (36.47) |
| | | | **US OE Mid-Cap Growth** | | | |
| 10/23/2017 | 9/30/2022 | MEFYX | MassMutual Mid Cap Growth Svc | 0.86 | 5/31/2000 | 32.77 |
| 10/3/2022 | Present | OTCKX | MFS Mid Cap Growth R6 | 0.66 | 1/2/2013 | 48.44 |
| | | | *Difference* | (0.20) | | (15.68) |
| 10/12/2016 | 9/30/2022 | PRNHX | T. Rowe Price New Horizons | 0.79 | 6/3/1960 | 106.84 |
| 10/3/2022 | Present | OEGIX | Invesco Discovery Mid Cap Growth R6 | 0.67 | 2/28/2013 | 89.91 |
| | | | *Difference* | (0.12) | | 16.92 |
| | | | **US OE Mid-Cap Value** | | | |
| 10/12/2016 | 9/30/2022 | WFMIX | Allspring Special Mid Cap Value Inst | 0.80 | 4/8/2005 | 57.44 |
| 10/3/2022 | Present | JVMRX | JHancock Disciplined Value Mid Cap R6 | 0.75 | 9/1/2011 | 52.33 |
| | | | *Difference* | (0.05) | | 5.11 |
| | | | **US OE Small Blend** | | | |
| 9/4/2020 | 9/30/2022 | DCCIX | Delaware Small Cap Core I | 0.80 | 12/29/1998 | 19.98 |
| 10/3/2022 | Present | VSMAX | Vanguard Small Cap Index Adm | 0.05 | 11/13/2000 | 12.37 |
| | | | *Difference* | (0.75) | | 7.61 |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/23/2017 | 9/30/2022 | CXXRX | Columbia Small Cap Index Inst2 | 0.20 | 11/8/2012 | 24.02 |
| 10/3/2022 | Present | VSMAX | Vanguard Small Cap Index Adm | 0.05 | 11/13/2000 | 27.80 |
| | | | **Difference** | **(0.15)** | | **(3.78)** |
| | | | **US OE Small Value** | | | |
| 11/15/2016 | 9/30/2022 | ESPNX | Allspring Special Small Cap Value Inst | 0.93 | 7/30/2010 | 32.17 |
| 10/3/2022 | Present | UBVFX | Undiscovered Managers Behavioral Val R6 | 0.80 | 4/30/2013 | 48.60 |
| | | | **Difference** | **(0.13)** | | **(16.42)** |
| | | | **US OE Technology** | | | |
| 10/23/2017 | 9/30/2022 | JATIX | Janus Henderson Glb Tech and Innovt I | 0.76 | 7/6/2009 | 62.80 |
| 10/3/2022 | Present | JATNX | Janus Henderson Glb Tech and Innovt N | 0.67 | 1/27/2017 | 63.40 |
| | | | **Difference** | **(0.09)** | | **(0.60)** |
| | | | **US OE Foreign Large Value** | | | |
| 11/15/2016 | 9/30/2022 | HFQIX | Janus Henderson Global Equity Income I | 0.82 | 3/31/2009 | 20.24 |
| 10/3/2022 | Present | HFQRX | Janus Henderson Global Equity Income N | 0.73 | 11/30/2015 | 20.72 |
| | | | **Difference** | **(0.09)** | | **(0.48)** |
| | | | **US OE Diversified Emerging Mkts** | | | |
| 10/12/2016 | 9/30/2022 | ODVYX | Invesco Developing Markets Y | 0.99 | 9/7/2005 | 2.34 |
| 10/3/2022 | Present | RNWGX | American Funds New World R6 | 0.57 | 5/1/2009 | 35.12 |
| | | | **Difference** | **(0.42)** | | **(32.78)** |
| | | | **US OE Global Large-Stock Blend** | | | |
| 10/12/2016 | 9/30/2022 | RWIEX | American Funds Capital World Gr&Inc R4 | 0.78 | 6/27/2002 | 37.71 |
| 10/3/2022 | Present | FEGRX | First Eagle Global R6 | 0.79 | 3/1/2017 | 29.16 |
| | | | **Difference** | **0.01** | | **8.55** |
| | | | **US OE Global Large-Stock Growth** | | | |
| 9/4/2020 | 9/30/2022 | RNPEX | American Funds New Perspective R4 | 0.77 | 5/28/2002 | -6.96 |
| 10/3/2022 | Present | RNPGX | American Funds New Perspective R6 | 0.42 | 5/1/2009 | -6.27 |
| | | | **Difference** | **(0.35)** | | **(0.68)** |
| | | | **US OE Intermediate Core-Plus Bond** | | | |
| 10/12/2016 | 9/30/2022 | WACPX | Western Asset Core Plus Bond I | 0.45 | 7/8/1998 | -1.98 |
| 9/4/2020 | Present | NERNX | Loomis Sayles Core Plus Bond N | 0.38 | 2/1/2013 | 4.29 |
| | | | **Difference** | **(0.07)** | | **(6.27)** |
| 10/12/2016 | 9/30/2022 | WACPX | Western Asset Core Plus Bond I | 0.45 | 7/8/1998 | -1.98 |
| 10/3/2022 | Present | FXNAX | Fidelity U.S. Bond Index | 0.03 | 5/4/2011 | -0.83 |
| | | | **Difference** | **(0.43)** | | **(1.15)** |
| | | | **US OE High Yield Bond** | | | |
| 10/12/2016 | 9/30/2022 | DLHYX | MassMutual High Yield Svc | 0.74 | 9/5/2000 | 15.50 |
| 10/3/2022 | Present | RITGX | American Funds American High-Inc R6 | 0.32 | 5/1/2009 | 23.43 |
| | | | **Difference** | **(0.42)** | | **(7.93)** |
| | | | **US OE Inflation-Protected Bond** | | | |
| 11/15/2016 | 9/30/2022 | PRRIX | PIMCO Real Return Instl | 0.67 | 1/29/1997 | 12.43 |
| 10/3/2022 | Present | VAIPX | Vanguard Inflation-Protected Secs Adm | 0.10 | 6/10/2005 | 11.30 |
| | | | **Difference** | **(0.57)** | | **1.13** |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | US OE Global Bond-USD Hedged | | | |
|---|---|---|---|---|---|---|
| 10/12/2016 | 6/30/2021 | PFRAX | PIMCO International Bond (USD-Hdg) Adm | 0.88 | 1/28/1997 | 17.81 |
| 7/1/2021 | Present | PFORX | PIMCO International Bond (USD-Hdg) Instl | 0.63 | 12/2/1992 | 19.20 |
| | | | *Difference* | *(0.25)* | | *(1.39)* |
| | | | **US OE Moderate Allocation** | | | |
| 11/15/2016 | 9/30/2022 | RLBEX | American Funds American Balanced R4 | 0.60 | 6/21/2002 | 42.57 |
| 10/3/2022 | Present | RLBGX | American Funds American Balanced R6 | 0.25 | 5/1/2009 | 45.47 |
| | | | *Difference* | *(0.35)* | | *(2.90)* |
| | | | **US OE Target-Date Retirement** | | | |
| 10/12/2016 | 9/3/2020 | JSRAX | JPMorgan SmartRetirement® Income A | 0.69 | 5/15/2006 | 24.95 |
| 10/3/2022 | Present | RFTTX | American Funds 2010 Trgt Date Retire R6 | 0.29 | 7/13/2009 | 28.93 |
| | | | *Difference* | *(0.40)* | | *(3.98)* |
| | | | **US OE Target-Date 2000-2010** | | | |
| 9/4/2020 | 9/30/2022 | RDATX | American Funds 2010 Trgt Date Retire R4 | 0.64 | 2/1/2007 | -2.77 |
| 10/3/2022 | Present | RFTTX | American Funds 2010 Trgt Date Retire R6 | 0.29 | 7/13/2009 | -2.05 |
| | | | *Difference* | *(0.35)* | | *(0.72)* |
| | | | **US OE Target-Date 2015** | | | |
| 9/4/2020 | 9/30/2022 | RDBTX | American Funds 2015 Trgt Date Retire R4 | 0.65 | 2/1/2007 | -2.81 |
| 10/3/2022 | Present | RFJTX | American Funds 2015 Trgt Date Retire R6 | 0.30 | 7/13/2009 | -2.12 |
| | | | *Difference* | *(0.35)* | | *(0.68)* |
| | | | **US OE Target-Date 2020** | | | |
| 9/4/2020 | 9/30/2022 | RDCTX | American Funds 2020 Trgt Date Retire R4 | 0.66 | 2/1/2007 | -3.42 |
| 10/3/2022 | Present | RRCTX | American Funds 2020 Trgt Date Retire R6 | 0.31 | 7/13/2009 | -2.65 |
| | | | *Difference* | *(0.35)* | | *(0.76)* |
| 10/12/2016 | 9/3/2020 | JTTAX | JPMorgan SmartRetirement® 2020 A | 0.75 | 5/15/2006 | 29.34 |
| 10/3/2022 | Present | RRCTX | American Funds 2020 Trgt Date Retire R6 | 0.31 | 7/13/2009 | 34.68 |
| | | | *Difference* | *(0.44)* | | *(5.33)* |
| | | | **US OE Target-Date 2025** | | | |
| 9/4/2020 | 9/30/2022 | RDDTX | American Funds 2025 Trgt Date Retire R4 | 0.67 | 2/1/2007 | -3.68 |
| 10/3/2022 | Present | RFDTX | American Funds 2025 Trgt Date Retire R6 | 0.32 | 7/13/2009 | -3.01 |
| | | | *Difference* | *(0.35)* | | *(0.67)* |
| | | | **US OE Target-Date 2030** | | | |
| 9/4/2020 | 9/30/2022 | RDETX | American Funds 2030 Trgt Date Retire R4 | 0.68 | 2/1/2007 | -3.25 |
| 10/3/2022 | Present | RFETX | American Funds 2030 Trgt Date Retire R6 | 0.33 | 7/13/2009 | -2.53 |
| | | | *Difference* | *(0.35)* | | *(0.72)* |
| 10/12/2016 | 9/3/2020 | JSMAX | JPMorgan SmartRetirement® 2030 A | 0.79 | 5/15/2006 | 37.00 |
| 10/3/2022 | Present | RFETX | American Funds 2030 Trgt Date Retire R6 | 0.33 | 7/13/2009 | 47.11 |
| | | | *Difference* | *(0.46)* | | *(10.11)* |
| | | | **US OE Target-Date 2035** | | | |

-48-

SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/4/2020 | 9/30/2022 | RDFTX | American Funds 2035 Trgt Date Retire R4 | 0.70 | 2/1/2007 | -2.07 |
| 10/3/2022 | Present | RFFTX | American Funds 2035 Trgt Date Retire R6 | 0.35 | 7/13/2009 | -1.34 |
| | | | **Difference** | **(0.35)** | | **(0.72)** |
| | | | **US OE Target-Date 2040** | | | |
| 9/4/2020 | 9/30/2022 | RDGTX | American Funds 2040 Trgt Date Retire R4 | 0.72 | 2/1/2007 | -2.06 |
| 10/3/2022 | Present | RFGTX | American Funds 2040 Trgt Date Retire R6 | 0.37 | 7/27/2009 | -1.35 |
| | | | **Difference** | **(0.35)** | | **(0.71)** |
| 10/12/2016 | 9/3/2020 | SMTAX | JPMorgan SmartRetirement® 2040 A | 0.84 | 5/15/2006 | 41.99 |
| 10/3/2022 | Present | RFGTX | American Funds 2040 Trgt Date Retire R6 | 0.37 | 7/27/2009 | 55.67 |
| | | | **Difference** | **(0.47)** | | **(13.68)** |
| | | | **US OE Target-Date 2045** | | | |
| 9/4/2020 | 9/30/2022 | RDHTX | American Funds 2045 Trgt Date Retire R4 | 0.72 | 2/1/2007 | -2.38 |
| 10/3/2022 | Present | RFHTX | American Funds 2045 Trgt Date Retire R6 | 0.37 | 7/13/2009 | -1.65 |
| | | | **Difference** | **(0.35)** | | **(0.73)** |
| | | | **US OE Target-Date 2050** | | | |
| 9/4/2020 | 9/30/2022 | RDITX | American Funds 2050 Trgt Date Retire R4 | 0.73 | 2/1/2007 | -3.04 |
| 10/3/2022 | Present | RFITX | American Funds 2050 Trgt Date Retire R6 | 0.38 | 7/13/2009 | -2.28 |
| | | | **Difference** | **(0.35)** | | **(0.76)** |
| 10/12/2016 | 9/3/2020 | JTSAX | JPMorgan SmartRetirement® 2050 A | 0.85 | 7/31/2007 | 42.03 |
| 10/3/2022 | Present | RFITX | American Funds 2050 Trgt Date Retire R6 | 0.38 | 7/13/2009 | 57.51 |
| | | | **Difference** | **(0.47)** | | **(15.48)** |
| | | | **US OE Target-Date 2055** | | | |
| 9/4/2020 | 9/30/2022 | RDJTX | American Funds 2055 Trgt Date Retire R4 | 0.73 | 2/1/2010 | -3.62 |
| 10/3/2022 | Present | RFKTX | American Funds 2055 Trgt Date Retire R6 | 0.38 | 2/1/2010 | -2.96 |
| | | | **Difference** | **(0.35)** | | **(0.66)** |
| | | | **US OE Target-Date 2060** | | | |
| 9/4/2020 | 9/30/2022 | RDKTX | American Funds 2060 Trgt Date Retire R4 | 0.74 | 3/27/2015 | -3.85 |
| 10/3/2022 | Present | RFUTX | American Funds 2060 Trgt Date Retire R6 | 0.39 | 3/27/2015 | -3.12 |
| | | | **Difference** | **(0.35)** | | **(0.72)** |
| | | | **US OE Target-Date 2065+** | | | |
| 9/4/2020 | 9/30/2022 | RDLTX | American Funds 2065 Trgt Date Retire R4 | 0.74 | 3/27/2020 | -3.78 |
| 10/3/2022 | Present | RFVTX | American Funds 2065 Trgt Date Retire R6 | 0.39 | 3/27/2020 | -3.09 |
| | | | **Difference** | **(0.35)** | | **(0.69)** |

SECOND AMENDED CLASS ACTION COMPLAINT

**3. Defendants Imprudently Maintained the Plan's Investment in the MassMutual Stable Value Option, When Lower Share Classes Existed and Other Investment Vendor Offered Superior Alternatives.**

196.    Starting in 2011, Defendants began offering the MassMutual SAGIC Diversified Bond as the Plan's only guaranteed income offering.    In 2016, Defendants transitioned this offering to the MassMutual Fixed Interest SAGIC.[6]

197.    Stable value funds generally are not SEC registered mutual funds. Single Company fixed annuity contracts that are structured as an insurance company general account, or an insurance company separate account, are solely regulated by the State Insurance Commissioner selected by the insurance company. Synthetic based stable value funds are run by a Registered Investment Advisor (RIA) regulated by the SEC but use a small amount of synthetic GIC's which sometimes are state regulated. The differences between the different types of funds are critical from a fiduciary standpoint.

198.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides higher consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value. Synthetic Stable value accounts "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.[7] Single fixed annuity contracts are set by the insurance company at their discretion.

---

[6] SAGIC refers to Separate Account Guaranteed Investment Account.
[7] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at: http://www.finweb.com/investing/stable-value-fund-vs-money-marketfund. html#axzz44EaLfQnQ

199.   The 401(k) marketplace for the largest plans, if they offer stable value funds, offer "synthetic" stable value funds, which are the least risky, because the fund owns the securities in the underlying funds which typically are 95%+ of the funds value. The annuity part or wrap is not only typically divided between insurers but only typically comprises 1-5% of the value at risk. While the majority of plans the size of Alorica's use a lower risk synthetic stable value product, there are still some Separate Account and General Account products. Separate account products, such as the MassMutual GIC, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier than synthetic stable value products, because they are not owned by the Plan but sit on the balance sheet of the insurer where they take on near 100% of the single entity credit and liquidity risk of MassMutual.

200.   In recent years, large 401(k) plans fled fixed annuity products backed by the general account of a single insurance company due to concerns about single entity credit and liquidity risk. Following the high-profile default failures of GIC Issuers in 1992 and 1993 by Executive and Confederation Life, the Federal Reserve expressed concerns about the high risk of the insurance company general account products and the flimsy nature of the state guarantees backing the insurance contracts. The industry immediately responded by offering more separate account contracts, which put creditors in line ahead of general account contracts but still resulted in 100% single entity credit and liquidity exposure. Synthetic value was created in 1995 and by 1999 most the largest plans were in a synthetic based stable value fund. Synthetic Stable value continued to gain market share over the next 20 years going into smaller and smaller plans. Some general account and separate accounts have existed in plans under $1 billion because of a lack of litigation until recently.

201.   In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators,

(NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed. This limits the ability of plan sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility.

202.   In this case, MassMutual placed the proceeds of the stable value fund in an insurance company separate account at MassMutual. MassMutual received spread fees – the difference between the returns made by MassMutual on the assets in the segregated account and the crediting rate paid to participants. Insurance company balance sheets allow leverage and have tax advantages that add to profits and return.

203.   An insurance company GIC, such as the MassMutual GIC here, is subject to the single entity credit risk of the insurance company that issues the contract. The crediting rate, set in advance by the insurance company and reset from time to time in its sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. Thus, Defendants had the opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hindsight. Further, Defendants should have specifically negotiated in the contract that MassMutual was a fiduciary and that it could exit at no costs if MassMutual was downgraded for any reason.  The single entity annuity contract constrained liquidity and the ability to replace it without incurring exit charges.

204.   In fact, there is substantial liquidity risk because there is no outside market for these contracts.

205.   Additionally, MassMutual has full control over the SAGIC's spread fees and thus has the ability to set (and manipulate) crediting rates.

SECOND AMENDED CLASS ACTION COMPLAINT

206. As of 2022, the Plan had $22,936,493 of assets in the MassMutual GIC for which MassMutual charged an "administrative fee" plus earned an undisclosed "spread."

207. Defendants did not have a viable methodology for monitoring the costs or performance of the MassMutual GIC. Not only were comparable products available from other providers with higher crediting rates, but identical or substantially identical products were available to Defendants from MassMutual and other stable value providers with higher crediting rates and lower spread fees.

208. In fact, in 2022, when MassMutual was acquired by Empower, the Plan had the option of keeping the MassMutual GIC with "zero revenue share" and a nearly 70 basis points higher crediting rate. Thus, it appears that the low crediting rate paid to the Plan is connected to Defendants' decision to pay excessive Plan fees through revenue sharing.

209. Had Defendants prudently managed the Plan, the Plan would have paid lower spread fees and obtained higher returns on its stable value fund.

210. Plaintiffs have calculated the estimated damages comparing the Plan's MassMutual GIC to MassMutual GIC rates offered to other plans throughout the relevant time period. Defendants obtained significantly lower crediting rates than other Plans invested in MassMutual's GIC product.

| Period Start | Alorica | Mass Mutual SAGIC DIVII | Excess Spread Fees | SV Assets ($) | Excess Spread Fees by Period ($) |
|---|---|---|---|---|---|
| 1/1/2017 | 2.70% | 3.59% | 0.89% | 14,415,186 | 32,074 |
| 4/1/2017 | 3.05% | 3.76% | 0.71% | 16,141,197 | 28,651 |
| 7/1/2017 | 2.90% | 3.79% | 0.89% | 17,867,208 | 39,755 |
| 10/1/2017 | 2.90% | 3.70% | 0.80% | 19,593,218 | 39,186 |
| 1/1/2018 | 2.90% | 3.69% | 0.79% | 21,319,229 | 42,105 |
| 4/1/2018 | 3.10% | 3.92% | 0.82% | 21,206,095 | 43,472 |
| 7/1/2018 | 3.10% | 4.81% | 1.71% | 21,092,961 | 90,172 |
| 10/1/2018 | 3.35% | 4.83% | 1.48% | 20,979,826 | 77,625 |
| 1/1/2019 | 3.00% | 4.78% | 1.78% | 20,866,692 | 92,857 |

-53-
SECOND AMENDED CLASS ACTION COMPLAINT

| | | | | | |
|---|---|---|---|---|---|
| 4/1/2019 | 3.05% | 4.78% | 1.73% | 21,002,566 | 90,836 |
| 7/1/2019 | 3.00% | 4.15% | 1.15% | 21,138,440 | 60,773 |
| 10/1/2019 | 2.65% | 4.09% | 1.44% | 21,274,313 | 76,588 |
| 1/1/2020 | 2.75% | 4.40% | 1.65% | 21,410,187 | 88,317 |
| 4/1/2020 | 2.75% | 4.03% | 1.28% | 21,791,764 | 69,734 |
| 7/1/2020 | 3.10% | 4.03% | 0.93% | 22,173,340 | 51,553 |
| 10/1/2020 | 3.10% | 4.03% | 0.93% | 22,554,917 | 52,440 |
| 1/1/2021 | 2.85% | 4.03% | 1.18% | 22,936,493 | 67,663 |
| 4/1/2021 | 2.85% | 4.03% | 1.18% | 22,620,159 | 66,729 |
| 7/1/2021 | 2.15% | 4.03% | 1.88% | 22,303,824 | 104,828 |
| 10/1/2021 | 2.35% | 4.03% | 1.68% | 21,987,490 | 92,347 |
| 1/1/2022 | 2.40% | 3.99% | 1.59% | 21,671,155 | 86,242 |
| 4/1/2022 | 2.45% | 4.35% | 1.90% | 21,671,155 | 103,007 |
| 7/1/2022 (estimated) | 2.45% | 4.34% | 1.89% | 21,671,155 | 102,655 |
| 10/1/2022 (estimated) | 2.45% | 4.41% | 1.96% | 21,671,155 | 106,266 |
| 1/1/2023 (estimated) | 2.45% | 4.38% | 1.93% | 21,731,985 | 104,603 |
| 4/1/2023 (estimated) | 2.45% | 4.30% | 1.85% | 21,731,985 | 100,263 |
| 7/1/2023 (estimated) | 2.45% | 4.34% | 1.89% | 21,731,985 | 102,639 |
| 10/1/2023 (estimated) | 2.45% | 4.34% | 1.89% | 21,731,985 | 102,639 |
| | | | | Total: | 2,116,021 |

211.   As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the GIC and to remove or replace it where a substantially identical investment option can be obtained from the same provider at a lower cost. *See, e.g.*, *Tibble v. Edison Int'l*, 843 F.3d at 1198 ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.").

## <u>CLASS ACTION ALLEGATIONS</u>

212.  Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

213.  All participants in or beneficiaries of the ALORICA 401(K) RETIREMENT PLAN from six years prior to the filing of the initial complaint in this matter through October 3, 2022 (the "Class Period" or "relevant time period").

214.  The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Plan has over 40,000 participants with account balances.

215.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual class members, including, *inter alia*:

(a) whether Defendants are fiduciaries of the Plan;

(b) whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendants breached their duty to monitor other fiduciaries of the Plan; and

(e) the extent of damage sustained by Class members and the appropriate measure of damages.

216.  Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

217.  Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

218.   Plaintiffs have no interests that conflict with those of the Class. Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

219.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty of Prudence

### (Against All Defendants)

220.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

221.   Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

222.   As a fiduciary of the Plan, Defendants were required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to

discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

223.   Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

224.   As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plan despite their high cost and poor performance relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

225.   In addition, Defendants failed to monitor or control excessive compensation paid for recordkeeping services which resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

226.   In addition, Defendants failed to monitor or control excessive

SECOND AMENDED CLASS ACTION COMPLAINT

compensation paid for shareholder or financial advising services which resulted from the unnecessary payment of those services as a percentage of assets.

227.   Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

228.   As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers**

**(Against All Defendants)**

229.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

230.   Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

SECOND AMENDED CLASS ACTION COMPLAINT

231.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

232.   Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

233.   Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

(d) failing to institute competitive bidding for covered service providers.

234.    As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendants complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

235.    Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), Defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Christina Humphrey Law, P.C. and Tower Legal Group, P.C. as Class Counsel;

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

SECOND AMENDED CLASS ACTION COMPLAINT

- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

- Order equitable restitution against Defendants;

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

Dated: March 18, 2024

**CHRISTINA HUMPHREY LAW, P.C.**
**TOWER LEGAL GROUP, P.C.**


By:    _/s/ Christina A. Humphrey_
     CHRISTINA A. HUMPHREY
     ROBERT N. FISHER
     JAMES A. CLARK
     RENEE P. ORTEGA
     Attorneys for Plaintiffs

SECOND AMENDED CLASS ACTION COMPLAINT

# EXHIBIT A

**Alorica – Committee Meeting Attendance**

| Name | Meetings Attended |
|---|---|
| Gwen Rodriguez | 11/15/2018<br>3/1/2019<br>5/13/2019<br>9/18/2019<br>2/26/2020<br>6/30/2020<br>2/24/2021<br>10/28/2021<br>2/28/2022<br>**Total: 9** |
| Deon Stenner | 11/15/2018<br>3/1/2019<br>5/13/2019<br>9/18/2019<br>2/26/2020<br>6/30/2020<br>2/24/2021<br>10/28/2021<br>2/28/2022<br>**Total: 9** |
| Elizabeth Lan (Cece) Pan | 11/15/2018<br>3/1/2019<br>9/18/2019<br>2/26/2020<br>6/30/2020<br>2/24/2021<br>10/28/2021<br>2/28/2022<br>**Total: 8** |
| Emily Kilgore | 11/15/2018<br>3/1/2019<br>9/18/2019<br>2/26/2020<br>6/30/2020<br>**Total: 6** |
| Matthew VonDette | 9/18/2019<br>2/26/2020<br>6/30/2020<br>2/24/2021<br>**Total: 4** |

| | |
|---|---|
| Dan Finnegan | 2/24/2021<br>10/28/2021<br>2/28/2022<br>**Total: 3** |
| Christania Pierre | 2/24/2021<br>10/28/2021<br>2/28/2022<br>**Total: 3** |
| Daniela Caporella | 11/15/2018<br>3/1/2019<br>**Total: 2** |
| Chris Hyun | 11/15/2018<br>3/1/2019<br>**Total: 2** |
| Rick Hayes | 11/15/2018<br>**Total: 1** |
| Adam Grossman | 3/1/2019<br>**Total: 1** |
| Steven Stark | 11/15/2018<br>**Total: 1** |
| Trina Jennings | 5/13/2019<br>**Total: 1** |
| Jae Chaney | 9/18/2019<br>**Total: 1** |
| Brady Burton | 2/26/2020<br>**Total: 1** |
| Michael Kelsey | 6/30/2020<br>**Total: 1** |
| Susan Dumond | 10/28/2021<br>**Total: 1** |
| Randy Maharaj | 2/28/2022<br>**Total: 1** |
| Sabrina Dickerson | 2/28/2022<br>**Total: 1** |

**ALORICA BOARD OF DIRECTORS RECOMMNEDED COMMITTEE MEMBERS**

| |
|---|
| Chris Hyun |
| Elizabeth Lan (Cece) Pan |
| Emily Kilgore |
| Rick Hayes |
| Ray Ortega |